# WISCONSIN *v.* YODER ET AL.

No. 70–110.   Argued December 8, 1971—Decided May 15, 1972

206

Burger, C. J., delivered the opinion of the Court, in which Brennan, Stewart, White, Marshall, and Blackmun, JJ., joined. Stewart, J., filed a concurring opinion, in which Brennan, J., joined, *post*, p. 237. White, J., filed a concurring opinion, in which Brennan and Stewart, JJ., joined, *post*, p. 237. Douglas, J., filed an opinion dissenting in part, *post*, p. 241. Powell and Rehnquist, JJ., took no part in the consideration or decision of the case.

*John W. Calhoun,* Assistant Attorney General of Wisconsin, argued the cause for petitioner. With him on the briefs were *Robert W. Warren,* Attorney General, and *William H. Wilker,* Assistant Attorney General.

*William B. Ball* argued the cause for respondents. With him on the brief was *Joseph G. Skelly.*

Briefs of *amici curiae* urging affirmance were filed by *Donald E. Showalter* for the Mennonite Central Com-

mittee; by *Boardman Noland* and *Lee Boothby* for the General Conference of Seventh-Day Adventists; by *William S. Ellis* for the National Council of the Churches of Christ; by *Nathan Lewin* for the National Jewish Commission on Law and Public Affairs; and by *Leo Pfeffer* for the Synagogue Council of America et al.

MR. CHIEF JUSTICE BURGER delivered the opinion of the Court.

On petition of the State of Wisconsin, we granted the writ of certiorari in this case to review a decision of the Wisconsin Supreme Court holding that respondents' convictions of violating the State's compulsory school-attendance law were invalid under the Free Exercise Clause of the First Amendment to the United States Constitution made applicable to the States by the Fourteenth Amendment. For the reasons hereafter stated we affirm the judgment of the Supreme Court of Wisconsin.

Respondents Jonas Yoder and Wallace Miller are members of the Old Order Amish religion, and respondent Adin Yutzy is a member of the Conservative Amish Mennonite Church. They and their families are residents of Green County, Wisconsin. Wisconsin's compulsory school-attendance law required them to cause their children to attend public or private school until reaching age 16 but the respondents declined to send their children, ages 14 and 15, to public school after they completed the eighth grade.[1] The children were not enrolled in any private school, or within any recognized exception to the compulsory-attendance law,[2] and they are conceded to be subject to the Wisconsin statute.

---

[1] The children, Frieda Yoder, aged 15, Barbara Miller, aged 15, and Vernon Yutzy, aged 14, were all graduates of the eighth grade of public school.

[2] Wis. Stat. § 118.15 (1969) provides in pertinent part:

"118.15 *Compulsory school attendance*

"(1)(a) Unless the child has a legal excuse or has graduated from

On complaint of the school district administrator for the public schools, respondents were charged, tried, and convicted of violating the compulsory-attendance law in Green County Court and were fined the sum of $5 each.[3] Respondents defended on the ground that the applica-

---

high school, any person having under his control a child who is between the ages of 7 and 16 years shall cause such child to attend school regularly during the full period and hours, religious holidays excepted, that the public or private school in which such child should be enrolled is in session until the end of the school term, quarter or semester of the school year in which he becomes 16 years of age.

.          .          .          .          .

"(3) This section does not apply to any child who is not in proper physical or mental condition to attend school, to any child exempted for good cause by the school board of the district in which the child resides or to any child who has completed the full 4-year high school course. The certificate of a reputable physician in general practice shall be sufficient proof that a child is unable to attend school.

"(4) Instruction during the required period elsewhere than at school may be substituted for school attendance. Such instruction must be approved by the state superintendent as substantially equivalent to instruction given to children of like ages in the public or private schools where such children reside.

"(5) Whoever violates this section . . . may be fined not less than $5 nor more than $50 or imprisoned not more than 3 months or both."

Section 118.15 (1)(b) requires attendance to age 18 in a school district containing a "vocational, technical and adult education school," but this section is concededly inapplicable in this case, for there is no such school in the district involved.

[3] Prior to trial, the attorney for respondents wrote the State Superintendent of Public Instruction in an effort to explore the possibilities for a compromise settlement. Among other possibilities, he suggested that perhaps the State Superintendent could administratively determine that the Amish could satisfy the compulsory-attendance law by establishing their own vocational training plan similar to one that has been established in Pennsylvania. Supp. App. 6. Under the Pennsylvania plan, Amish children of high school age are required to attend an Amish vocational school for

tion of the compulsory-attendance law violated their rights under the First and Fourteenth Amendments.[4] The trial testimony showed that respondents believed, in accordance with the tenets of Old Order Amish communities generally, that their children's attendance at high school, public or private, was contrary to the Amish religion and way of life. They believed that by sending their children to high school, they would not only expose themselves to the danger of the censure of the church community, but, as found by the county court, also endanger their own salvation and that of their children. The State stipulated that respondents' religious beliefs were sincere.

In support of their position, respondents presented as expert witnesses scholars on religion and education whose testimony is uncontradicted. They expressed their opinions on the relationship of the Amish belief concerning school attendance to the more general tenets of their religion, and described the impact that compulsory high school attendance could have on the continued survival of Amish communities as they exist in the United States today. The history of the Amish

---

three hours a week, during which time they are taught such subjects as English, mathematics, health, and social studies by an Amish teacher. For the balance of the week, the children perform farm and household duties under parental supervision, and keep a journal of their daily activities. The major portion of the curriculum is home projects in agriculture and homemaking. See generally J. Hostetler & G. Huntington, Children in Amish Society: Socialization and Community Education, c. 5 (1971). A similar program has been instituted in Indiana. *Ibid.* See also Iowa Code § 299.24 (1971); Kan. Stat. Ann. § 72–1111 (Supp. 1971).

The Superintendent rejected this proposal on the ground that it would not afford Amish children "substantially equivalent education" to that offered in the schools of the area. Supp. App. 6.

[4] The First Amendment provides: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . . ."

sect was given in some detail, beginning with the Swiss Anabaptists of the 16th century who rejected institutionalized churches and sought to return to the early, simple, Christian life de-emphasizing material success, rejecting the competitive spirit, and seeking to insulate themselves from the modern world. As a result of their common heritage, Old Order Amish communities today are characterized by a fundamental belief that salvation requires life in a church community separate and apart from the world and worldly influence. This concept of life aloof from the world and its values is central to their faith.

A related feature of Old Order Amish communities is their devotion to a life in harmony with nature and the soil, as exemplified by the simple life of the early Christian era that continued in America during much of our early national life. Amish beliefs require members of the community to make their living by farming or closely related activities. Broadly speaking, the Old Order Amish religion pervades and determines the entire mode of life of its adherents. Their conduct is regulated in great detail by the *Ordnung,* or rules, of the church community. Adult baptism, which occurs in late adolescence, is the time at which Amish young people voluntarily undertake heavy obligations, not unlike the Bar Mitzvah of the Jews, to abide by the rules of the church community.[5]

Amish objection to formal education beyond the eighth grade is firmly grounded in these central religious concepts. They object to the high school, and higher education generally, because the values they teach

---

[5] See generally J. Hostetler, Amish Society (1968); J. Hostetler & G. Huntington, Children in Amish Society (1971); Littell, Sectarian Protestantism and the Pursuit of Wisdom: Must Technological Objectives Prevail?, in Public Controls for Nonpublic Schools 61 (D. Erickson ed. 1969).

are in marked variance with Amish values and the Amish way of life; they view secondary school education as an impermissible exposure of their children to a "worldly" influence in conflict with their beliefs. The high school tends to emphasize intellectual and scientific accomplishments, self-distinction, competitiveness, worldly success, and social life with other students. Amish society emphasizes informal learning-through-doing; a life of "goodness," rather than a life of intellect; wisdom, rather than technical knowledge; community welfare, rather than competition; and separation from, rather than integration with, contemporary worldly society.

Formal high school education beyond the eighth grade is contrary to Amish beliefs, not only because it places Amish children in an environment hostile to Amish beliefs with increasing emphasis on competition in class work and sports and with pressure to conform to the styles, manners, and ways of the peer group, but also because it takes them away from their community, physically and emotionally, during the crucial and formative adolescent period of life. During this period, the children must acquire Amish attitudes favoring manual work and self-reliance and the specific skills needed to perform the adult role of an Amish farmer or housewife. They must learn to enjoy physical labor. Once a child has learned basic reading, writing, and elementary mathematics, these traits, skills, and attitudes admittedly fall within the category of those best learned through example and "doing" rather than in a classroom. And, at this time in life, the Amish child must also grow in his faith and his relationship to the Amish community if he is to be prepared to accept the heavy obligations imposed by adult baptism. In short, high school attendance with teachers who are not of the Amish faith—and may even be hostile to it—interposes a serious barrier to the integration of the Amish child into

the Amish religious community. Dr. John Hostetler, one of the experts on Amish society, testified that the modern high school is not equipped, in curriculum or social environment, to impart the values promoted by Amish society.

The Amish do not object to elementary education through the first eight grades as a general proposition because they agree that their children must have basic skills in the "three R's" in order to read the Bible, to be good farmers and citizens, and to be able to deal with non-Amish people when necessary in the course of daily affairs. They view such a basic education as acceptable because it does not significantly expose their children to worldly values or interfere with their development in the Amish community during the crucial adolescent period. While Amish accept compulsory elementary education generally, wherever possible they have established their own elementary schools in many respects like the small local schools of the past. In the Amish belief higher learning tends to develop values they reject as influences that alienate man from God.

On the basis of such considerations, Dr. Hostetler testified that compulsory high school attendance could not only result in great psychological harm to Amish children, because of the conflicts it would produce, but would also, in his opinion, ultimately result in the destruction of the Old Order Amish church community as it exists in the United States today. The testimony of Dr. Donald A. Erickson, an expert witness on education, also showed that the Amish succeed in preparing their high school age children to be productive members of the Amish community. He described their system of learning through doing the skills directly relevant to their adult roles in the Amish community as "ideal" and perhaps superior to ordinary high school education. The evidence also showed that the Amish have an excellent

record as law-abiding and generally self-sufficient members of society.

Although the trial court in its careful findings determined that the Wisconsin compulsory school-attendance law "does interfere with the freedom of the Defendants to act in accordance with their sincere religious belief" it also concluded that the requirement of high school attendance until age 16 was a "reasonable and constitutional" exercise of governmental power, and therefore denied the motion to dismiss the charges. The Wisconsin Circuit Court affirmed the convictions. The Wisconsin Supreme Court, however, sustained respondents' claim under the Free Exercise Clause of the First Amendment and reversed the convictions. A majority of the court was of the opinion that the State had failed to make an adequate showing that its interest in "establishing and maintaining an educational system overrides the defendants' right to the free exercise of their religion." 49 Wis. 2d 430, 447, 182 N. W. 2d 539, 547 (1971).

## I

There is no doubt as to the power of a State, having a high responsibility for education of its citizens, to impose reasonable regulations for the control and duration of basic education. See, e. g., Pierce v. Society of Sisters, 268 U. S. 510, 534 (1925). Providing public schools ranks at the very apex of the function of a State. Yet even this paramount responsibility was, in Pierce, made to yield to the right of parents to provide an equivalent education in a privately operated system. There the Court held that Oregon's statute compelling attendance in a public school from age eight to age 16 unreasonably interfered with the interest of parents in directing the rearing of their offspring, including their education in church-operated schools. As that case suggests, the values of parental direction of the religious upbringing

and education of their children in their early and formative years have a high place in our society. See also *Ginsberg* v. *New York*, 390 U. S. 629, 639 (1968); *Meyer* v. *Nebraska*, 262 U. S. 390 (1923); cf. *Rowan* v. *Post Office Dept.*, 397 U. S. 728 (1970). Thus, a State's interest in universal education, however highly we rank it, is not totally free from a balancing process when it impinges on fundamental rights and interests, such as those specifically protected by the Free Exercise Clause of the First Amendment, and the traditional interest of parents with respect to the religious upbringing of their children so long as they, in the words of *Pierce*, "prepare [them] for additional obligations." 268 U. S., at 535.

It follows that in order for Wisconsin to compel school attendance beyond the eighth grade against a claim that such attendance interferes with the practice of a legitimate religious belief, it must appear either that the State does not deny the free exercise of religious belief by its requirement, or that there is a state interest of sufficient magnitude to override the interest claiming protection under the Free Exercise Clause. Long before there was general acknowledgment of the need for universal formal education, the Religion Clauses had specifically and firmly fixed the right to free exercise of religious beliefs, and buttressing this fundamental right was an equally firm, even if less explicit, prohibition against the establishment of any religion by government. The values underlying these two provisions relating to religion have been zealously protected, sometimes even at the expense of other interests of admittedly high social importance. The invalidation of financial aid to parochial schools by government grants for a salary subsidy for teachers is but one example of the extent to which courts have gone in this regard, notwithstanding that such aid programs were legislatively determined to be in the public interest and the service of sound educational policy by States and by Congress. *Lemon* v.

*Kurtzman,* 403 U. S. 602 (1971); *Tilton* v. *Richardson,* 403 U. S. 672 (1971). See also *Everson* v. *Board of Education,* 330 U. S. 1, 18 (1947).

The essence of all that has been said and written on the subject is that only those interests of the highest order and those not otherwise served can overbalance legitimate claims to the free exercise of religion. We can accept it as settled, therefore, that, however strong the State's interest in universal compulsory education, it is by no means absolute to the exclusion or subordination of all other interests. *E. g., Sherbert* v. *Verner,* 374 U. S. 398 (1963); *McGowan* v. *Maryland,* 366 U. S. 420, 459 (1961) (separate opinion of Frankfurter, J.); *Prince* v. *Massachusetts,* 321 U. S. 158, 165 (1944).

## II

We come then to the quality of the claims of the respondents concerning the alleged encroachment of Wisconsin's compulsory school-attendance statute on their rights and the rights of their children to the free exercise of the religious beliefs they and their forebears have adhered to for almost three centuries. In evaluating those claims we must be careful to determine whether the Amish religious faith and their mode of life are, as they claim, inseparable and interdependent. A way of life, however virtuous and admirable, may not be interposed as a barrier to reasonable state regulation of education if it is based on purely secular considerations; to have the protection of the Religion Clauses, the claims must be rooted in religious belief. Although a determination of what is a "religious" belief or practice entitled to constitutional protection may present a most delicate question,[6] the very concept of ordered liberty precludes

---

[6] See *Welsh* v. *United States,* 398 U. S. 333, 351–361 (1970) (Harlan, J., concurring in result); *United States* v. *Ballard,* 322 U. S. 78 (1944).

allowing every person to make his own standards on matters of conduct in which society as a whole has important interests. Thus, if the Amish asserted their claims because of their subjective evaluation and rejection of the contemporary secular values accepted by the majority, much as Thoreau rejected the social values of his time and isolated himself at Walden Pond, their claims would not rest on a religious basis. Thoreau's choice was philosophical and personal rather than religious, and such belief does not rise to the demands of the Religion Clauses.

Giving no weight to such secular considerations, however, we see that the record in this case abundantly supports the claim that the traditional way of life of the Amish is not merely a matter of personal preference, but one of deep religious conviction, shared by an organized group, and intimately related to daily living. That the Old Order Amish daily life and religious practice stem from their faith is shown by the fact that it is in response to their literal interpretation of the Biblical injunction from the Epistle of Paul to the Romans, "be not conformed to this world . . . ." This command is fundamental to the Amish faith. Moreover, for the Old Order Amish, religion is not simply a matter of theocratic belief. As the expert witnesses explained, the Old Order Amish religion pervades and determines virtually their entire way of life, regulating it with the detail of the Talmudic diet through the strictly enforced rules of the church community.

The record shows that the respondents' religious beliefs and attitude toward life, family, and home have remained constant—perhaps some would say static—in a period of unparalleled progress in human knowledge generally and great changes in education.[7] The re-

---

[7] See generally R. Butts & L. Cremin, A History of Education in American Culture (1953); L. Cremin, The Transformation of the School (1961).

spondents freely concede, and indeed assert as an article of faith, that their religious beliefs and what we would today call "life style" have not altered in fundamentals for centuries. Their way of life in a church-oriented community, separated from the outside world and "worldly" influences, their attachment to nature and the soil, is a way inherently simple and uncomplicated, albeit difficult to preserve against the pressure to conform. Their rejection of telephones, automobiles, radios, and television, their mode of dress, of speech, their habits of manual work do indeed set them apart from much of contemporary society; these customs are both symbolic and practical.

As the society around the Amish has become more populous, urban, industrialized, and complex, particularly in this century, government. regulation of human affairs has correspondingly become more detailed and pervasive. The Amish mode of life has thus come into conflict increasingly with requirements of contemporary society exerting a hydraulic insistence on conformity to majoritarian standards. So long as compulsory education laws were confined to eight grades of elementary basic education imparted in a nearby rural schoolhouse, with a large proportion of students of the Amish faith, the Old Order Amish had little basis to fear that school attendance would expose their children to the worldly influence they reject. But modern compulsory secondary education in rural areas is now largely carried on in a consolidated school, often remote from the student's home and alien to his daily home life. As the record so strongly shows, the values and programs of the modern secondary school are in sharp conflict with the fundamental mode of life mandated by the Amish religion; modern laws requiring compulsory secondary education have accordingly engendered great concern and conflict.[8]

---

[8] Hostetler, *supra,* n. 5, c. 9; Hostetler & Huntington, *supra,* n. 5.

The conclusion is inescapable that secondary schooling, by exposing Amish children to worldly influences in terms of attitudes, goals, and values contrary to beliefs, and by substantially interfering with the religious development of the Amish child and his integration into the way of life of the Amish faith community at the crucial adolescent stage of development, contravenes the basic religious tenets and practice of the Amish faith, both as to the parent and the child.

The impact of the compulsory-attendance law on respondents' practice of the Amish religion is not only severe, but inescapable, for the Wisconsin law affirmatively compels them, under threat of criminal sanction, to perform acts undeniably at odds with fundamental tenets of their religious beliefs. See *Braunfeld* v. *Brown,* 366 U. S. 599, 605 (1961). Nor is the impact of the compulsory-attendance law confined to grave interference with important Amish religious tenets from a subjective point of view. It carries with it precisely the kind of objective danger to the free exercise of religion that the First Amendment was designed to prevent. As the record shows, compulsory school attendance to age 16 for Amish children carries with it a very real threat of undermining the Amish community and religious practice as they exist today; they must either abandon belief and be assimilated into society at large, or be forced to migrate to some other and more tolerant region.[9]

---

[9] Some States have developed working arrangements with the Amish regarding high school attendance. See n. 3, *supra.* However, the danger to the continued existence of an ancient religious faith cannot be ignored simply because of the assumption that its adherents will continue to be able, at considerable sacrifice, to relocate in some more tolerant State or country or work out accommodations under threat of criminal prosecution. Forced migration of religious minorities was an evil that lay at the heart of the Religion Clauses. See, *e. g., Everson* v. *Board of Education,* 330 U. S. 1, 9–10 (1947); Madison, Memorial and Remonstrance Against

In sum, the unchallenged testimony of acknowledged experts in education and religious history, almost 300 years of consistent practice, and strong evidence of a sustained faith pervading and regulating respondents' entire mode of life support the claim that enforcement of the State's requirement of compulsory formal education after the eighth grade would gravely endanger if not destroy the free exercise of respondents' religious beliefs.

## III

Neither the findings of the trial court nor the Amish claims as to the nature of their faith are challenged in this Court by the State of Wisconsin. Its position is that the State's interest in universal compulsory formal secondary education to age 16 is so great that it is paramount to the undisputed claims of respondents that their mode of preparing their youth for Amish life, after the traditional elementary education, is an essential part of their religious belief and practice. Nor does the State undertake to meet the claim that the Amish mode of life and education is inseparable from and a part of the basic tenets of their religion—indeed, as much a part of their religious belief and practices as baptism, the confessional, or a sabbath may be for others.

Wisconsin concedes that under the Religion Clauses religious beliefs are absolutely free from the State's control, but it argues that "actions," even though religiously grounded, are outside the protection of the First Amendment.[10] But our decisions have rejected the idea that

---

Religious Assessments, 2 Writings of James Madison 183 (G. Hunt ed. 1901).

[10] That has been the apparent ground for decision in several previous state cases rejecting claims for exemption similar to that here. See, *e. g.*, *State* v. *Garber*, 197 Kan. 567, 419 P. 2d 896 (1966), cert. denied, 389 U. S. 51 (1967); *State* v. *Hershberger*, 103 Ohio App. 188, 144 N. E. 2d 693 (1955); *Commonwealth* v. *Beiler*, 168 Pa. Super. 462, 79 A. 2d 134 (1951).

religiously grounded conduct is always outside the protection of the Free Exercise Clause. It is true that activities of individuals, even when religiously based, are often subject to regulation by the States in the exercise of their undoubted power to promote the health, safety, and general welfare, or the Federal Government in the exercise of its delegated powers. See, *e. g., Gillette* v. *United States,* 401 U. S. 437 (1971); *Braunfeld* v. *Brown,* 366 U. S. 599 (1961); *Prince* v. *Massachusetts,* 321 U. S. 158 (1944); *Reynolds* v. *United States,* 98 U. S. 145 (1879). But to agree that religiously grounded conduct must often be subject to the broad police power of the State is not to deny that there are areas of conduct protected by the Free Exercise Clause of the First Amendment and thus beyond the power of the State to control, even under regulations of general applicability. *E. g., Sherbert* v. *Verner,* 374 U. S. 398 (1963); *Murdock* v. *Pennsylvania,* 319 U. S. 105 (1943); *Cantwell* v. *Connecticut,* 310 U. S. 296, 303–304 (1940). This case, therefore, does not become easier because respondents were convicted for their "actions" in refusing to send their children to the public high school; in this context belief and action cannot be neatly confined in logic-tight compartments. Cf. *Lemon* v. *Kurtzman,* 403 U. S., at 612.

Nor can this case be disposed of on the grounds that Wisconsin's requirement for school attendance to age 16 applies uniformly to all citizens of the State and does not, on its face, discriminate against religions or a particular religion, or that it is motivated by legitimate secular concerns. A regulation neutral on its face may, in its application, nonetheless offend the constitutional requirement for governmental neutrality if it unduly burdens the free exercise of religion. *Sherbert* v. *Verner, supra;* cf. *Walz* v. *Tax Commission,* 397 U. S. 664 (1970). The Court must not ignore the danger that an exception

from a general obligation of citizenship on religious grounds may run afoul of the Establishment Clause, but that danger cannot be allowed to prevent any exception no matter how vital it may be to the protection of values promoted by the right of free exercise. By preserving doctrinal flexibility and recognizing the need for a sensible and realistic application of the Religion Clauses

> "we have been able to chart a course that preserved the autonomy and freedom of religious bodies while avoiding any semblance of established religion. This is a 'tight rope' and one we have successfully traversed." *Walz* v. *Tax Commission, supra,* at 672.

We turn, then, to the State's broader contention that its interest in its system of compulsory education is so compelling that even the established religious practices of the Amish must give way. Where fundamental claims of religious freedom are at stake, however, we cannot accept such a sweeping claim; despite its admitted validity in the generality of cases, we must searchingly examine the interests that the State seeks to promote by its requirement for compulsory education to age 16, and the impediment to those objectives that would flow from recognizing the claimed Amish exemption. See, *e. g., Sherbert* v. *Verner, supra; Martin* v. *City of Struthers,* 319 U. S. 141 (1943); *Schneider* v. *State,* 308 U. S. 147 (1939).

The State advances two primary arguments in support of its system of compulsory education. It notes, as Thomas Jefferson pointed out early in our history, that some degree of education is necessary to prepare citizens to participate effectively and intelligently in our open political system if we are to preserve freedom and independence. Further, education prepares individuals to be self-reliant and self-sufficient participants in society. We accept these propositions.

However, the evidence adduced by the Amish in this case is persuasively to the effect that an additional one or two years of formal high school for Amish children in place of their long-established program of informal vocational education would do little to serve those interests. Respondents' experts testified at trial, without challenge, that the value of all education must be assessed in terms of its capacity to prepare the child for life. It is one thing to say that compulsory education for a year or two beyond the eighth grade may be necessary when its goal is the preparation of the child for life in modern society as the majority live, but it is quite another if the goal of education be viewed as the preparation of the child for life in the separated agrarian community that is the keystone of the Amish faith. See *Meyer* v. *Nebraska,* 262 U. S., at 400.

The State attacks respondents' position as one fostering "ignorance" from which the child must be protected by the State. No one can question the State's duty to protect children from ignorance but this argument does not square with the facts disclosed in the record. Whatever their idiosyncrasies as seen by the majority, this record strongly shows that the Amish community has been a highly successful social unit within our society, even if apart from the conventional "mainstream." Its members are productive and very law-abiding members of society; they reject public welfare in any of its usual modern forms. The Congress itself recognized their self-sufficiency by authorizing exemption of such groups as the Amish from the obligation to pay social security taxes.[11]

---

[11] Title 26 U. S. C. § 1402 (h) authorizes the Secretary of Health, Education, and Welfare to exempt members of "a recognized religious sect" existing at all times since December 31, 1950, from the obligation to pay social security taxes if they are, by reason of the tenets of their sect, opposed to receipt of such benefits and agree

It is neither fair nor correct to suggest that the Amish are opposed to education beyond the eighth grade level. What this record shows is that they are opposed to conventional formal education of the type provided by a certified high school because it comes at the child's crucial adolescent period of religious development. Dr. Donald Erickson, for example, testified that their system of learning-by-doing was an "ideal system" of education in terms of preparing Amish children for life as adults in the Amish community, and that "I would be inclined to say they do a better job in this than most of the rest of us do." As he put it, "These people aren't purporting to be learned people, and it seems to me the self-sufficiency of the community is the best evidence I can point to— whatever is being done seems to function well." [12]

We must not forget that in the Middle Ages important values of the civilization of the Western World were preserved by members of religious orders who isolated themselves from all worldly influences against great obstacles. There can be no assumption that today's majority is

---

to waive them, provided the Secretary finds that the sect makes reasonable provision for its dependent members. The history of the exemption shows it was enacted with the situation of the Old Order Amish specifically in view. H. R. Rep. No. 213, 89th Cong., 1st Sess., 101–102 (1965).

The record in this case establishes without contradiction that the Green County Amish had never been known to commit crimes, that none had been known to receive public assistance, and that none were unemployed.

[12] Dr. Erickson had previously written: "Many public educators would be elated if their programs were as successful in preparing students for productive community life as the Amish system seems to be. In fact, while some public schoolmen strive to outlaw the Amish approach, others are being forced to emulate many of its features." Erickson, Showdown at an Amish Schoolhouse: A Description and Analysis of the Iowa Controversy, in Public Controls for Nonpublic Schools 15, 53 (D. Erickson ed. 1969). And see Littell, supra, n. 5, at 61.

"right" and the Amish and others like them are "wrong." A way of life that is odd or even erratic but interferes with no rights or interests of others is not to be condemned because it is different.

The State, however, supports its interest in providing an additional one or two years of compulsory high school education to Amish children because of the possibility that some such children will choose to leave the Amish community, and that if this occurs they will be ill-equipped for life. The State argues that if Amish children leave their church they should not be in the position of making their way in the world without the education available in the one or two additional years the State requires. However, on this record, that argument is highly speculative. There is no specific evidence of the loss of Amish adherents by attrition, nor is there any showing that upon leaving the Amish community Amish children, with their practical agricultural training and habits of industry and self-reliance, would become burdens on society because of educational shortcomings. Indeed, this argument of the State appears to rest primarily on the State's mistaken assumption, already noted, that the Amish do not provide any education for their children beyond the eighth grade, but allow them to grow in "ignorance." To the contrary, not only do the Amish accept the necessity for formal schooling through the eighth grade level, but continue to provide what has been characterized by the undisputed testimony of expert educators as an "ideal" vocational education for their children in the adolescent years.

There is nothing in this record to suggest that the Amish qualities of reliability, self-reliance, and dedication to work would fail to find ready markets in today's society. Absent some contrary evidence supporting the

State's position, we are unwilling to assume that persons possessing such valuable vocational skills and habits are doomed to become burdens on society should they determine to leave the Amish faith, nor is there any basis in the record to warrant a finding that an additional one or two years of formal school education beyond the eighth grade would serve to eliminate any such problem that might exist.

Insofar as the State's claim rests on the view that a brief additional period of formal education is imperative to enable the Amish to participate effectively and intelligently in our democratic process, it must fall. The Amish alternative to formal secondary school education has enabled them to function effectively in their day-to-day life under self-imposed limitations on relations with the world, and to survive and prosper in contemporary society as a separate, sharply identifiable and highly self-sufficient community for more than 200 years in this country. In itself this is strong evidence that they are capable of fulfilling the social and political responsibilities of citizenship without compelled attendance beyond the eighth grade at the price of jeopardizing their free exercise of religious belief.[13] When Thomas Jefferson emphasized the need for education as a bulwark of a free people against tyranny, there is nothing to indicate he had in mind compulsory education through any fixed age beyond a basic education. Indeed, the Amish communities singularly parallel and reflect many of the virtues of Jefferson's ideal of the "sturdy yeoman" who would form the basis of what he considered as the

---

[13] All of the children involved in this case are graduates of the eighth grade. In the county court, the defense introduced a study by Dr. Hostetler indicating that Amish children in the eighth grade achieved comparably to non-Amish children in the basic skills. Supp. App. 9–11. See generally Hostetler & Huntington, *supra*, n. 5, at 88–96.

ideal of a democratic society.[14]   Even their idiosyncratic separateness exemplifies the diversity we profess to admire and encourage.

The requirement for compulsory education beyond the eighth grade is a relatively recent development in our history.   Less than 60 years ago, the educational requirements of almost all of the States were satisfied by completion of the elementary grades, at least where the child was regularly and lawfully employed.[15]   The inde-

---

[14] While Jefferson recognized that education was essential to the welfare and liberty of the people, he was reluctant to directly force instruction of children "in opposition to the will of the parent." Instead he proposed that state citizenship be conditioned on the ability to "read readily in some tongue, native or acquired."   Letter from Thomas Jefferson to Joseph Cabell, Sept. 9, 1817, in 17 Writings of Thomas Jefferson 417, 423–424 (Mem. ed. 1904).   And it is clear that, so far as the mass of the people were concerned, he envisaged that a basic education in the "three R's" would sufficiently meet the interests of the State.   He suggested that after completion of elementary school, "those destined for labor will engage in the business of agriculture, or enter into apprenticeships to such handicraft art as may be their choice."   Letter from Thomas Jefferson to Peter Carr, Sept. 7, 1814, in Thomas Jefferson and Education in a Republic 93–106 (Arrowood ed. 1930).   See also *id.*, at 60–64, 70, 83, 136–137.

[15] See Dept. of Interior, Bureau of Education, Bulletin No. 47, Digest of State Laws Relating to Public Education 527–559 (1916); Joint Hearings on S. 2475 and H. R. 7200 before the Senate Committee on Education and Labor and the House Committee on Labor, 75th Cong., 1st Sess., pt. 2, p. 416.

Even today, an eighth grade education fully satisfies the educational requirements of at least six States. See Ariz. Rev. Stat. Ann. § 15–321 (B)(4) (1956); Ark. Stat. Ann. § 80–1504 (1947); Iowa Code § 299.2 (1971); S. D. Comp. Laws Ann. § 13–27–1 (1967); Wyo. Stat. Ann. § 21.1–48 (Supp. 1971). (Mississippi has no compulsory education law.)   A number of other States have flexible provisions permitting children aged 14 or having completed the eighth grade to be excused from school in order to engage in lawful employment. *E. g.,* Colo. Rev. Stat. Ann. §§ 123–20–5, 80–6–1 to 80–6–12

pendence and successful social functioning of the Amish community for a period approaching almost three centuries and more than 200 years in this country are strong evidence that there is at best a speculative gain, in terms of meeting the duties of citizenship, from an additional one or two years of compulsory formal education. Against this background it would require a more particularized showing from the State on this point to justify the severe interference with religious freedom such additional compulsory attendance would entail.

We should also note that compulsory education and child labor laws find their historical origin in common humanitarian instincts, and that the age limits of both laws have been coordinated to achieve their related objectives.[16] In the context of this case, such considera-

---

(1963); Conn. Gen. Stat. Rev. §§ 10–184, 10–189 (1964); D. C. Code Ann. §§ 31–202, 36–201 to 36–228 (1967); Ind. Ann. Stat. §§ 28–505 to 28–506, 28–519 (1948); Mass. Gen. Laws Ann., c. 76, § 1 (Supp. 1972) and c. 149, § 86 (1971); Mo. Rev. Stat. §§ 167.031, 294.051 (1969); Nev. Rev. Stat. § 392.110 (1968); N. M. Stat. Ann. § 77–10–6 (1968).

An eighth grade education satisfied Wisconsin's formal education requirements until 1933. See Wis. Laws 1927, c. 425, § 97; Laws 1933, c. 143. (Prior to 1933, provision was made for attendance at continuation or vocational schools by working children past the eighth grade, but only if one was maintained by the community in question.) For a general discussion of the early development of Wisconsin's compulsory education and child labor laws, see F. Ensign, Compulsory School Attendance and Child Labor 203–230 (1921).

[16] See, *e. g.,* Joint Hearings, *supra,* n. 15, pt. 1, at 185–187 (statement of Frances Perkins, Secretary of Labor), pt. 2, at 381–387 (statement of Katherine Lenroot, Chief, Children's Bureau, Department of Labor); National Child Labor Committee, 40th Anniversary Report, The Long Road (1944); 1 G. Abbott, The Child and the State 259–269, 566 (Greenwood reprint 1968); L. Cremin, The Transformation of the School, c. 3 (1961); A. Steinhilber & C. Sokolowski, State Law on Compulsory Attendance 3–4 (Dept. of Health, Education, and Welfare 1966).

tions, if anything, support rather than detract from respondents' position. The origins of the requirement for school attendance to age 16, an age falling after the completion of elementary school but before completion of high school, are not entirely clear. But to some extent such laws reflected the movement to prohibit most child labor under age 16 that culminated in the provisions of the Federal Fair Labor Standards Act of 1938.[17]  It is true, then, that the 16-year child labor age limit may to some degree derive from a contemporary impression that children should be in school until that age. But at the same time, it cannot be denied that, conversely, the 16-year education limit reflects, in substantial measure, the concern that children under that age not be employed under conditions hazardous to their health, or in work that should be performed by adults.

The requirement of compulsory schooling to age 16 must therefore be viewed as aimed not merely at providing educational opportunities for children, but as an alternative to the equally undesirable consequence of unhealthful child labor displacing adult workers, or, on the other hand, forced idleness.[18]  The two kinds of statutes—compulsory school attendance and child labor laws—tend to keep children of certain ages off the labor market and in school; this regimen in turn provides opportunity to prepare for a livelihood of a higher order than that which children could pursue without education and protects their health in adolescence.

In these terms, Wisconsin's interest in compelling the school attendance of Amish children to age 16 emerges as somewhat less substantial than requiring such attend-

[17] 52 Stat. 1060, as amended, 29 U. S. C. §§ 201–219.

[18] See materials cited n. 16, *supra;* Casad, Compulsory Education and Individual Rights, in 5 Religion and the Public Order 51, 82 (D. Giannella ed. 1969).

ance for children generally. For, while agricultural employment is not totally outside the legitimate concerns of the child labor laws, employment of children under parental guidance and on the family farm from age 14 to age 16 is an ancient tradition that lies at the periphery of the objectives of such laws.[19] There is no intimation that the Amish employment of their children on family farms is in any way deleterious to their health or that Amish parents exploit children at tender years. Any such inference would be contrary to the record before us. Moreover, employment of Amish children on the family farm does not present the undesirable economic aspects of eliminating jobs that might otherwise be held by adults.

## IV

Finally, the State, on authority of *Prince* v. *Massachusetts,* argues that a decision exempting Amish children from the State's requirement fails to recognize the substantive right of the Amish child to a secondary education, and fails to give due regard to the power of the State as *parens patriae* to extend the benefit of secondary education to children regardless of the wishes of their parents. Taken at its broadest sweep, the Court's language in *Prince,* might be read to give support to the State's position. However, the Court was not confronted in *Prince* with a situation comparable to that of the Amish as revealed in this record; this is shown by the

---

[19] See, *e. g.,* Abbott, *supra,* n. 16, at 266. The Federal Fair Labor Standards Act of 1938 excludes from its definition of "[o]ppressive child labor" employment of a child under age 16 by "a parent . . . employing his own child . . . in an occupation other than manufacturing or mining or an occupation found by the Secretary of Labor to be particularly hazardous for the employment of children between the ages of sixteen and eighteen years or detrimental to their health or well-being." 29 U. S. C. § 203 (*l*).

Court's severe characterization of the evils that it thought the legislature could legitimately associate with child labor, even when performed in the company of an adult. 321 U. S., at 169–170. The Court later took great care to confine *Prince* to a narrow scope in *Sherbert* v. *Verner,* when it stated:

> "On the other hand, the Court has rejected challenges under the Free Exercise Clause to governmental regulation of certain overt acts prompted by religious beliefs or principles, for 'even when the action is in accord with one's religious convictions, [it] is not totally free from legislative restrictions.' *Braunfeld* v. *Brown,* 366 U. S. 599, 603. The conduct or actions so regulated have invariably posed some substantial threat to public safety, peace or order. See, *e. g., Reynolds* v. *United States,* 98 U. S. 145; *Jacobson* v. *Massachusetts,* 197 U. S. 11; *Prince* v. *Massachusetts,* 321 U. S. 158 . . . ." 374 U. S., at 402–403.

This case, of course, is not one in which any harm to the physical or mental health of the child or to the public safety, peace, order, or welfare has been demonstrated or may be properly inferred.[20] The record is to the contrary, and any reliance on that theory would find no support in the evidence.

Contrary to the suggestion of the dissenting opinion of MR. JUSTICE DOUGLAS, our holding today in no degree depends on the assertion of the religious interest of the child as contrasted with that of the parents. It is the parents who are subject to prosecution here for failing to cause their children to attend school, and it

---

[20] Cf. *e. g., Jacobson* v. *Massachusetts,* 197 U. S. 11 (1905); *Wright* v. *DeWitt School District,* 238 Ark. 906, 385 S. W. 2d 644 (1965); *Application of President and Directors of Georgetown College, Inc.,* 118 U. S. App. D. C. 80, 87–90, 331 F. 2d 1000, 1007–1010 (in-chambers opinion), cert. denied, 377 U. S. 978 (1964).

is their right of free exercise, not that of their children, that must determine Wisconsin's power to impose criminal penalties on the parent. The dissent argues that a child who expresses a desire to attend public high school in conflict with the wishes of his parents should not be prevented from doing so. There is no reason for the Court to consider that point since it is not an issue in the case. The children are not parties to this litigation. The State has at no point tried this case on the theory that respondents were preventing their children from attending school against their expressed desires, and indeed the record is to the contrary.[21] The State's position from the outset has been that it is empowered to apply its compulsory-attendance law to Amish parents in the same manner as to other parents— that is, without regard to the wishes of the child. That is the claim we reject today.

Our holding in no way determines the proper resolution of possible competing interests of parents, children, and the State in an appropriate state court proceeding in which the power of the State is asserted on the theory that Amish parents are preventing their minor children from attending high school despite their expressed desires to the contrary. Recognition of the claim of the State in such a proceeding would, of course, call into question traditional concepts of parental control over the religious upbringing and education of their minor children recognized in this Court's past decisions. It is clear that such an intrusion by a State into family decisions in the area of religious training would give rise to grave questions of religious freedom comparable to those raised here

---

[21] The only relevant testimony in the record is to the effect that the wishes of the one child who testified corresponded with those of her parents. Testimony of Frieda Yoder, Tr. 92–94, to the effect that her personal religious beliefs guided her decision to discontinue school attendance after the eighth grade. The other children were not called by either side.

and those presented in *Pierce* v. *Society of Sisters,* 268 U. S. 510 (1925). On this record we neither reach nor decide those issues.

The State's argument proceeds without reliance on any actual conflict between the wishes of parents and children. It appears to rest on the potential that exemption of Amish parents from the requirements of the compulsory-education law might allow some parents to act contrary to the best interests of their children by foreclosing their opportunity to make an intelligent choice between the Amish way of life and that of the outside world. The same argument could, of course, be made with respect to all church schools short of college. There is nothing in the record or in the ordinary course of human experience to suggest that non-Amish parents generally consult with children of ages 14–16 if they are placed in a church school of the parents' faith.

Indeed it seems clear that if the State is empowered, as *parens patriae,* to "save" a child from himself or his Amish parents by requiring an additional two years of compulsory formal high school education, the State will in large measure influence, if not determine, the religious future of the child. Even more markedly than in *Prince,* therefore, this case involves the fundamental interest of parents, as contrasted with that of the State, to guide the religious future and education of their children. The history and culture of Western civilization reflect a strong tradition of parental concern for the nurture and upbringing of their children. This primary role of the parents in the upbringing of their children is now established beyond debate as an enduring American tradition. If not the first, perhaps the most significant statements of the Court in this area are found in *Pierce* v. *Society of Sisters,* in which the Court observed:

"Under the doctrine of *Meyer* v. *Nebraska,* 262 U. S. 390, we think it entirely plain that the Act

of 1922 unreasonably interferes with the liberty of parents and guardians to direct the upbringing and education of children under their control. As often heretofore pointed out, rights guaranteed by the Constitution may not be abridged by legislation which has no reasonable relation to some purpose within the competency of the State. The fundamental theory of liberty upon which all governments in this Union repose excludes any general power of the State to standardize its children by forcing them to accept instruction from public teachers only. The child is not the mere creature of the State; those who nurture him and direct his destiny have the right, coupled with the high duty, to recognize and prepare him for additional obligations." 268 U. S., at 534–535.

The duty to prepare the child for "additional obligations," referred to by the Court, must be read to include the inculcation of moral standards, religious beliefs, and elements of good citizenship. *Pierce,* of course, recognized that where nothing more than the general interest of the parent in the nurture and education of his children is involved, it is beyond dispute that the State acts "reasonably" and constitutionally in requiring education to age 16 in some public or private school meeting the standards prescribed by the State.

However read, the Court's holding in *Pierce* stands as a charter of the rights of parents to direct the religious upbringing of their children. And, when the interests of parenthood are combined with a free exercise claim of the nature revealed by this record, more than merely a "reasonable relation to some purpose within the competency of the State" is required to sustain the validity of the State's requirement under the First Amendment. To be sure, the power of the parent, even when linked to a free exercise claim, may be subject to limitation under *Prince*

if it appears that parental decisions will jeopardize the health or safety of the child, or have a potential for significant social burdens. But in this case, the Amish have introduced persuasive evidence undermining the arguments the State has advanced to support its claims in terms of the welfare of the child and society as a whole. The record strongly indicates that accommodating the religious objections of the Amish by forgoing one, or at most two, additional years of compulsory education will not impair the physical or mental health of the child, or result in an inability to be self-supporting or to discharge the duties and responsibilities of citizenship, or in any other way materially detract from the welfare of society.

In the face of our consistent emphasis on the central values underlying the Religion Clauses in our constitutional scheme of government, we cannot accept a *parens patriae* claim of such all-encompassing scope and with such sweeping potential for broad and unforeseeable application as that urged by the State.

## V

For the reasons stated we hold, with the Supreme Court of Wisconsin, that the First and Fourteenth Amendments prevent the State from compelling respondents to cause their children to attend formal high school to age 16.[22] Our disposition of this case, however, in no way

---

[22] What we have said should meet the suggestion that the decision of the Wisconsin Supreme Court recognizing an exemption for the Amish from the State's system of compulsory education constituted an impermissible establishment of religion. In *Walz* v. *Tax Commission,* the Court saw the three main concerns against which the Establishment Clause sought to protect as "sponsorship, financial support, and active involvement of the sovereign in religious activity." 397 U. S. 664, 668 (1970). Accommodating the religious beliefs of the Amish can hardly be characterized as sponsorship or active involvement. The purpose and effect of such an exemption are not

alters our recognition of the obvious fact that courts are not school boards or legislatures, and are ill-equipped to determine the "necessity" of discrete aspects of a State's program of compulsory education. This should suggest that courts must move with great circumspection in performing the sensitive and delicate task of weighing a State's legitimate social concern when faced with religious claims for exemption from generally applicable educational requirements. It cannot be overemphasized that we are not dealing with a way of life and mode of educa- — tion by a group claiming to have recently discovered some "progressive" or more enlightened process for rearing children for modern life.

Aided by a history of three centuries as an identifiable religious sect and a long history as a successful and self-sufficient segment of American society, the Amish in this case have convincingly demonstrated the sincerity of their religious beliefs, the interrelationship of belief with their mode of life, the vital role that belief and daily conduct play in the continued survival of Old Order Amish communities and their religious organization, and the hazards presented by the State's enforcement of a statute generally valid as to others. Beyond this, they have carried the even more difficult burden of demonstrating the adequacy of their alternative mode of continuing informal vocational education in terms of precisely those overall interests that the State advances in support of its program of compulsory high school education. In light of this con-

---

to support, favor, advance, or assist the Amish, but to allow their centuries-old religious society, here long before the advent of any compulsory education, to survive free from the heavy impediment compliance with the Wisconsin compulsory-education law would impose. Such an accommodation "reflects nothing more than the governmental obligation of neutrality in the face of religious differences, and does not represent that involvement of religious with secular institutions which it is the object of the Establishment Clause to forestall." *Sherbert* v. *Verner,* 374 U. S. 398, 409 (1963).

vincing showing, one that probably few other religious groups or sects could make, and weighing the minimal difference between what the State would require and what the Amish already accept, it was incumbent on the State to show with more particularity how its admittedly strong interest in compulsory education would be adversely affected by granting an exemption to the Amish. *Sherbert* v. *Verner, supra.*

Nothing we hold is intended to undermine the general applicability of the State's compulsory school-attendance statutes or to limit the power of the State to promulgate reasonable standards that, while not impairing the free exercise of religion, provide for continuing agricultural vocational education under parental and church guidance by the Old Order Amish or others similarly situated. The States have had a long history of amicable and effective relationships with church-sponsored schools, and there is no basis for assuming that, in this related context, reasonable standards cannot be established concerning the content of the continuing vocational education of Amish children under parental guidance, provided always that state regulations are not inconsistent with what we have said in this opinion.[23]

*Affirmed.*

MR. JUSTICE POWELL and MR. JUSTICE REHNQUIST took no part in the consideration or decision of this case.

---

[23] Several States have now adopted plans to accommodate Amish religious beliefs through the establishment of an "Amish vocational school." See n. 3, *supra.* These are not schools in the traditional sense of the word. As previously noted, respondents attempted to reach a compromise with the State of Wisconsin patterned after the Pennsylvania plan, but those efforts were not productive. There is no basis to assume that Wisconsin will be unable to reach a satisfactory accommodation with the Amish in light of what we now hold, so as to serve its interests without impinging on respondents' protected free exercise of their religion.

Mr. Justice Stewart, with whom Mr. Justice Brennan joins, concurring.

This case involves the constitutionality of imposing criminal punishment upon Amish parents for their religiously based refusal to compel their children to attend public high schools. Wisconsin has sought to brand these parents as criminals for following *their* religious beliefs, and the Court today rightly holds that Wisconsin cannot constitutionally do so.

This case in no way involves any questions regarding the right of the children of Amish parents to attend public high schools, or any other institutions of learning, if they wish to do so. As the Court points out, there is no suggestion whatever in the record that the religious beliefs of the children here concerned differ in any way from those of their parents. Only one of the children testified. The last two questions and answers on her cross-examination accurately sum up her testimony:

> "Q. So I take it then, Frieda, the only reason you are not going to school, and did not go to school since last September, is because of *your* religion?
> "A. Yes.
> "Q. That is the only reason?
> "A. Yes."   (Emphasis supplied.)

It is clear to me, therefore, that this record simply does not present the interesting and important issue discussed in Part II of the dissenting opinion of Mr. Justice Douglas. With this observation, I join the opinion and the judgment of the Court.

Mr. Justice White, with whom Mr. Justice Brennan and Mr. Justice Stewart join, concurring.

Cases such as this one inevitably call for a delicate balancing of important but conflicting interests. I join the opinion and judgment of the Court because I cannot

say that the State's interest in requiring two more years of compulsory education in the ninth and tenth grades outweighs the importance of the concededly sincere Amish religious practice to the survival of that sect.

This would be a very different case for me if respondents' claim were that their religion forbade their children from attending any school at any time and from complying in any way with the educational standards set by the State. Since the Amish children are permitted to acquire the basic tools of literacy to survive in modern society by attending grades one through eight and since the deviation from the State's compulsory-education law is relatively slight, I conclude that respondents' claim must prevail, largely because "religious freedom— the freedom to believe and to practice strange and, it may be, foreign creeds—has classically been one of the highest values of our society." *Braunfeld* v. *Brown*, 366 U. S. 599, 612 (1961) (BRENNAN, J., concurring and dissenting).

The importance of the state interest asserted here cannot be denigrated, however:

> "Today, education is perhaps the most important function of state and local governments. Compulsory school attendance laws and the great expenditures for education both demonstrate our recognition of the importance of education to our democratic society. It is required in the performance of our most basic public responsibilities, even service in the armed forces. It is the very foundation of good citizenship. Today it is a principal instrument in awakening the child to cultural values, in preparing him for later professional training, and in helping him to adjust normally to his environment." *Brown* v. *Board of Education*, 347 U. S. 483, 493 (1954).

As recently as last Term, the Court re-emphasized the legitimacy of the State's concern for enforcing minimal educational standards, *Lemon* v. *Kurtzman*, 403 U. S. 602, 613 (1971).[1] *Pierce* v. *Society of Sisters*, 268 U. S. 510 (1925), lends no support to the contention that parents may replace state educational requirements with their own idiosyncratic views of what knowledge a child needs to be a productive and happy member of society; in *Pierce*, both the parochial and military schools were in compliance with all the educational standards that the State had set, and the Court held simply that while a State may posit such standards, it may not pre-empt the educational process by requiring children to attend public schools.[2] In the present case, the State is not concerned with the maintenance of an educational system as an end in itself, it is rather attempting to nurture and develop the human potential of its children, whether Amish or non-Amish: to expand their knowledge, broaden their sensibilities, kindle their imagination, foster a spirit of free inquiry, and increase their human understanding and tolerance. It is possible that most Amish

---

[1] The challenged Amish religious practice here does not pose a substantial threat to public safety, peace, or order; if it did, analysis under the Free Exercise Clause would be substantially different. See *Jacobson* v. *Massachusetts*, 197 U. S. 11 (1905); *Prince* v. *Massachusetts*, 321 U. S. 158 (1944); *Cleveland* v. *United States*, 329 U. S. 14 (1946); *Application of President and Directors of Georgetown College, Inc.*, 118 U. S. App. D. C. 80, 331 F. 2d 1000, cert. denied, 377 U. S. 978 (1964).

[2] "No question is raised concerning the power of the State reasonably to regulate all schools, to inspect, supervise and examine them, their teachers and pupils; to require that all children of proper age attend some school, that teachers shall be of good moral character and patriotic disposition, that certain studies plainly essential to good citizenship must be taught, and that nothing be taught which is manifestly inimical to the public welfare." *Pierce* v. *Society of Sisters*, 268 U. S. 510, 534 (1925).

children will wish to continue living the rural life of their parents, in which case their training at home will adequately equip them for their future role. Others, however, may wish to become nuclear physicists, ballet dancers, computer programmers, or historians, and for these occupations, formal training will be necessary. There is evidence in the record that many children desert the Amish faith when they come of age.[3] A State has a legitimate interest not only in seeking to develop the latent talents of its children but also in seeking to prepare them for the life style that they may later choose, or at least to provide them with an option other than the life they have led in the past. In the circumstances of this case, although the question is close, I am unable to say that the State has demonstrated that Amish children who leave school in the eighth grade will be intellectually stultified or unable to acquire new academic skills later. The statutory minimum school attendance age set by the State is, after all, only 16.

Decision in cases such as this and the administration of an exemption for Old Order Amish from the State's compulsory school-attendance laws will inevitably involve the kind of close and perhaps repeated scrutiny of religious practices, as is exemplified in today's opinion, which the Court has heretofore been anxious to avoid. But such entanglement does not create a forbidden establishment of religion where it is essential to implement free

---

[3] Dr. Hostetler testified that though there was a gradual increase in the total number of Old Order Amish in the United States over the past 50 years, "at the same time the Amish have also lost members [of] their church" and that the turnover rate was such that "probably two-thirds [of the present Amish] have been assimilated non-Amish people." App. 110. Justice Heffernan, dissenting below, opined that "[l]arge numbers of young people voluntarily leave the Amish community each year and are thereafter forced to make their way in the world." 49 Wis. 2d 430, 451, 182 N. W. 2d 539, 549 (1971).

exercise values threatened by an otherwise neutral program instituted to foster some permissible, nonreligious state objective. I join the Court because the sincerity of the Amish religious policy here is uncontested, because the potentially adverse impact of the state requirement is great, and because the State's valid interest in education has already been largely satisfied by the eight years the children have already spent in school.

MR. JUSTICE DOUGLAS, dissenting in part.

I

I agree with the Court that the religious scruples of the Amish are opposed to the education of their children beyond the grade schools, yet I disagree with the Court's conclusion that the matter is within the dispensation of parents alone. The Court's analysis assumes that the only interests at stake in the case are those of the Amish parents on the one hand, and those of the State on the other. The difficulty with this approach is that, despite the Court's claim, the parents are seeking to vindicate not only their own free exercise claims, but also those of their high-school-age children.

It is argued that the right of the Amish children to religious freedom is not presented by the facts of the case, as the issue before the Court involves only the Amish parents' religious freedom to defy a state criminal statute imposing upon them an affirmative duty to cause their children to attend high school.

First, respondents' motion to dismiss in the trial court expressly asserts, not only the religious liberty of the adults, but also that of the children, as a defense to the prosecutions. It is, of course, beyond question that the parents have standing as defendants in a criminal prosecution to assert the religious interests of their

children as a defense.[1]  Although the lower courts and a majority of this Court assume an identity of interest between parent and child, it is clear that they have treated the religious interest of the child as a factor in the analysis.

Second, it is essential to reach the question to decide the case, not only because the question was squarely raised in the motion to dismiss, but also because no analysis of religious-liberty claims can take place in a vacuum.  If the parents in this case are allowed a religious exemption, the inevitable effect is to impose the parents' notions of religious duty upon their children. Where the child is mature enough to express potentially conflicting desires, it would be an invasion of the child's rights to permit such an imposition without canvassing his views.  As in *Prince* v. *Massachusetts,* 321 U. S. 158, it is an imposition resulting from this very litigation.  As the child has no other effective forum, it is in this litigation that his rights should be considered.  And, if an Amish child desires to attend high school, and is mature enough to have that desire respected, the State may well be able to override the parents' religiously motivated objections.

---

[1] Thus, in *Prince* v. *Massachusetts,* 321 U. S. 158, a Jehovah's Witness was convicted for having violated a state child labor law by allowing her nine-year-old niece and ward to circulate religious literature on the public streets.  There, as here, the narrow question was the religious liberty of the adult.  There, as here, the Court analyzed the problem from the point of view of the State's conflicting interest in the welfare of the child.  But, as MR. JUSTICE BRENNAN, speaking for the Court, has so recently pointed out, "The Court [in *Prince*] implicitly held that the custodian had standing to assert alleged freedom of religion . . . rights of the child that were threatened in the very litigation before the Court and that the child had no effective way of asserting herself." *Eisenstadt* v. *Baird,* 405 U. S. 438, 446 n. 6.  Here, as in *Prince,* the children have no effective alternate means to vindicate their rights.  The question, therefore, is squarely before us.

Religion is an individual experience. It is not necessary, nor even appropriate, for every Amish child to express his views on the subject in a prosecution of a single adult. Crucial, however, are the views of the child whose parent is the subject of the suit. Frieda Yoder has in fact testified that her own religious views are opposed to high-school education. I therefore join the judgment of the Court as to respondent Jonas Yoder. But Frieda Yoder's views may not be those of Vernon Yutzy or Barbara Miller. I must dissent, therefore, as to respondents Adin Yutzy and Wallace Miller as their motion to dismiss also raised the question of their children's religious liberty.

## II

This issue has never been squarely presented before today. Our opinions are full of talk about the power of the parents over the child's education. See *Pierce* v. *Society of Sisters,* 268 U. S. 510; *Meyer* v. *Nebraska,* 262 U. S. 390. And we have in the past analyzed similar conflicts between parent and State with little regard for the views of the child. See *Prince* v. *Massachusetts, supra.* Recent cases, however, have clearly held that the children themselves have constitutionally protectible interests.

These children are "persons" within the meaning of the Bill of Rights. We have so held over and over again. In *Haley* v. *Ohio,* 332 U. S. 596, we extended the protection of the Fourteenth Amendment in a state trial of a 15-year-old boy. In *In re Gault,* 387 U. S. 1, 13, we held that "neither the Fourteenth Amendment nor the Bill of Rights is for adults alone." In *In re Winship,* 397 U. S. 358, we held that a 12-year-old boy, when charged with an act which would be a crime if committed by an adult, was entitled to procedural safeguards contained in the Sixth Amendment.

In *Tinker* v. *Des Moines School District,* 393 U. S. 503, we dealt with 13-year-old, 15-year-old, and 16-year-old students who wore armbands to public schools and were disciplined for doing so. We gave them relief, saying that their First Amendment rights had been abridged.

> "Students in school as well as out of school are 'persons' under our Constitution. They are possessed of fundamental rights which the State must respect, just as they themselves must respect their obligations to the State." *Id.,* at 511.

In *Board of Education* v. *Barnette,* 319 U. S. 624, we held that schoolchildren, whose religious beliefs collided with a school rule requiring them to salute the flag, could not be required to do so. While the sanction included expulsion of the students and prosecution of the parents, *id.,* at 630, the vice of the regime was its interference with the child's free exercise of religion. We said: "Here . . . we are dealing with a compulsion of students to declare a belief." *Id.,* at 631. In emphasizing the important and delicate task of boards of education we said:

> "That they are educating the young for citizenship is reason for scrupulous protection of Constitutional freedoms of the individual, if we are not to strangle the free mind at its source and teach youth to discount important principles of our government as mere platitudes." *Id.,* at 637.

On this important and vital matter of education, I think the children should be entitled to be heard. While the parents, absent dissent, normally speak for the entire family, the education of the child is a matter on which the child will often have decided views. He may want to be a pianist or an astronaut or an oceanog-

rapher. To do so he will have to break from the Amish tradition.[2]

It is the future of the student, not the future of the parents, that is imperiled by today's decision. If a parent keeps his child out of school beyond the grade school, then the child will be forever barred from entry into the new and amazing world of diversity that we have today. The child may decide that that is the preferred course, or he may rebel. It is the student's judgment, not his parents', that is essential if we are to give full meaning to what we have said about the Bill of Rights and of the right of students to be masters of their own destiny.[3] If he is harnessed to the Amish way of life

[2] A significant number of Amish children do leave the Old Order. Professor Hostetler notes that "[t]he loss of members is very limited in some Amish districts and considerable in others." J. Hostetler, Amish Society 226 (1968). In one Pennsylvania church, he observed a defection rate of 30%. *Ibid.* Rates up to 50% have been reported by others. Casad, Compulsory High School Attendance and the Old Order Amish: A Commentary on State v. Garber, 16 Kan. L. Rev. 423, 434 n. 51 (1968).

[3] The court below brushed aside the students' interests with the offhand comment that "[w]hen a child reaches the age of judgment, he can choose for himself his religion." 49 Wis. 2d 430, 440, 182 N. W. 2d 539, 543. But there is nothing in this record to indicate that the moral and intellectual judgment demanded of the student by the question in this case is beyond his capacity. Children far younger than the 14- and 15-year-olds involved here are regularly permitted to testify in custody and other proceedings. Indeed, the failure to call the affected child in a custody hearing is often reversible error. See, *e. g., Callicott* v. *Callicott*, 364 S. W. 2d 455 (Civ. App. Tex.) (reversible error for trial judge to refuse to hear testimony of eight-year-old in custody battle). Moreover, there is substantial agreement among child psychologists and sociologists that the moral and intellectual maturity of the 14-year-old approaches that of the adult. See, *e. g.,* J. Piaget, The Moral Judgment of the Child (1948); D. Elkind, Children and Adolescents 75–80 (1970); Kohlberg, Moral Education in the Schools: A Developmental View, in R. Muuss, Adolescent Behavior and Society 193, 199–200 (1971);

by those in authority over him and if his education is truncated, his entire life may be stunted and deformed. The child, therefore, should be given an opportunity to be heard before the State gives the exemption which we honor today.

The views of the two children in question were not canvassed by the Wisconsin courts. The matter should be explicitly reserved so that new hearings can be held on remand of the case.[4]

### III

I think the emphasis of the Court on the "law and order" record of this Amish group of people is quite irrelevant. A religion is a religion irrespective of what the misdemeanor or felony records of its members might be. I am not at all sure how the Catholics, Episcopalians, the Baptists, Jehovah's Witnesses, the Unitarians, and my own Presbyterians would make out if subjected to such a test. It is, of course, true that if a group or society was organized to perpetuate crime and if that is its motive, we would have rather startling problems akin to those that were raised when some years back a particular sect was challenged here as operating on a fraudulent basis. *United States* v. *Ballard,* 322 U. S. 78. But no such factors are present here, and the Amish, whether with a high or low crim-

---

W. Kay, Moral Devolpment 172–183 (1968); A. Gesell & F. Ilg, Youth: The Years From Ten to Sixteen 175–182 (1956). The maturity of Amish youth, who identify with and assume adult roles from early childhood, see M. Goodman, The Culture of Childhood 92–94 (1970), is certainly not less than that of children in the general population.

[4] Canvassing the views of all school-age Amish children in the State of Wisconsin would not present insurmountable difficulties. A 1968 survey indicated that there were at that time only 256 such children in the entire State. Comment, 1971 Wis. L. Rev. 832, 852 n. 132.

inal record,[5] certainly qualify by all historic standards as a religion within the meaning of the First Amendment.

The Court rightly rejects the notion that actions, even though religiously grounded, are always outside the protection of the Free Exercise Clause of the First Amendment. In so ruling, the Court departs from the teaching of *Reynolds* v. *United States*, 98 U. S. 145, 164, where it was said concerning the reach of the Free Exercise Clause of the First Amendment, "Congress was deprived of all legislative power over mere opinion, but was left free to reach actions which were in violation of social duties or subversive of good order." In that case it was conceded that polygamy was a part of the religion of the Mormons. Yet the Court said, "It matters not that his belief [in polygamy] was a part of his professed religion: it was still belief, and belief only." *Id.*, at 167.

Action, which the Court deemed to be antisocial, could be punished even though it was grounded on deeply held and sincere religious convictions. What we do today, at least in this respect, opens the way to give organized religion a broader base than it has ever enjoyed; and it even promises that in time *Reynolds* will be overruled.

In another way, however, the Court retreats when in reference to Henry Thoreau it says his "choice was philo-

---

[5] The observation of Justice Heffernan, dissenting below, that the principal opinion in his court portrayed the Amish as leading a life of "idyllic agrarianism," is equally applicable to the majority opinion in this Court. So, too, is his observation that such a portrayal rests on a "mythological basis." Professor Hostetler has noted that "[d]rinking among the youth is common in all the large Amish settlements." Amish Society 283. Moreover, "[i]t would appear that among the Amish the rate of suicide is just as high, if not higher, than for the nation." *Id.*, at 300. He also notes an unfortunate Amish "preoccupation with filthy stories," *id.*, at 282, as well as significant "rowdyism and stress." *Id.*, at 281. These are not traits peculiar to the Amish, of course. The point is that the Amish are not people set apart and different.

sophical and personal rather than religious, and such belief does not rise to the demands of the Religion Clauses." That is contrary to what we held in *United States* v. *Seeger,* 380 U. S. 163, where we were concerned with the meaning of the words "religious training and belief" in the Selective Service Act, which were the basis of many conscientious objector claims. We said:

> "Within that phrase would come all sincere religious beliefs which are based upon a power or being, or upon a faith, to which all else is subordinate or upon which all else is ultimately dependent. The test might be stated in these words: A sincere and meaningful belief which occupies in the life of its possessor a place parallel to that filled by the God of those admittedly qualifying for the exemption comes within the statutory definition. This construction avoids imputing to Congress an intent to classify different religious beliefs, exempting some and excluding others, and is in accord with the well-established congressional policy of equal treatment for those whose opposition to service is grounded in their religious tenets." *Id.,* at 176.

*Welsh* v. *United States,* 398 U. S. 333, was in the same vein, the Court saying:

> "In this case, Welsh's conscientious objection to war was undeniably based in part on his perception of world politics. In a letter to his local board, he wrote:
> " 'I can only act according to what I am and what I see. And I see that the military complex wastes both human and material resources, that it fosters disregard for (what I consider a paramount concern) human needs and ends; I see that the means we employ to "defend" our "way of life" profoundly change that way of life. I see that in our failure to

recognize the political, social, and economic realities of the world, we, *as a nation,* fail our responsibility *as a nation.'* " *Id.,* at 342.

The essence of Welsh's philosophy, on the basis of which we held he was entitled to an exemption, was in these words:

> " 'I believe that human life is valuable in and of itself; in its living; therefore I will not injure or kill another human being. This belief (and the corresponding "duty" to abstain from violence toward another person) is not "superior to those arising from any human relation." On the contrary: *it is essential to every human relation.* I cannot, therefore, conscientiously comply with the Government's insistence that I assume duties which I feel are immoral and totally repugnant.' " *Id.,* at 343.

I adhere to these exalted views of "religion" and see no acceptable alternative to them now that we have become a Nation of many religions and sects, representing all of the diversities of the human race. *United States* v. *Seeger,* 380 U. S., at 192–193 (concurring opinion).