Alvaro L. HERNANDEZ, Jr., Plaintiff-Appellant,

v.

W.J. ESTELLE, Jr., Director, Texas Department of Corrections, et al., Defendants-Appellees.

No. 85–2057
Summary Calendar.

United States Court of Appeals, Fifth Circuit.

May 9, 1986.

Rehearing and Rehearing En Banc Denied July 8, 1986.

Alvaro L. Hernandez, Jr., pro se.

Jim Mattox, Atty. Gen., Adrian L. Young, Asst. Atty. Gen., Austin, Tex., for defendants-appellees.

Before CLARK, Chief Judge, and WILLIAMS and HIGGINBOTHAM, Circuit Judges.

PER CURIAM:

Appellant, Alvaro L. Hernandez, Jr., is an inmate of the Texas Department of Corrections (TDC). He filed this civil rights action in August 1979, under 42 U.S.C. § 1983, alleging that certain TDC officials had violated his free speech rights under the First Amendment. His suit is against the Director of the TDC, the Warden of the Ellis Unit where he was imprisoned, the Chairman of the Texas Board of Corrections, and the Chairman of the TDC Director's Review Committee. He alleged the unconstitutional censorship of the May 15-June 14, 1979, issue of Torch-La Antor-cha, a bilingual publication of the Revolutionary Socialist League of New York. The prison having determined not to distribute this issue to appellant and other subscribers within the prison system, he sought declaratory, injunctive, and monetary relief.

The defendant officials filed a motion to dismiss on the ground that Hernandez was a member of the plaintiff class in *Guajardo v. Estelle*, 580 F.2d 748, 760 (5th Cir. 1978), which set up certain controlling principles for the censorship of publications sent into units of the TDC. The claim of the defendants was that appellant had no right to maintain a separate action when the class litigating the issue in *Guajardo* adequately protected his rights. The district court granted the motion to dismiss the claims for declaratory and injunctive relief, but the claims for monetary relief were found not to be controlled by *Guajardo* and the suit was allowed to proceed.

Both parties agreed to trial before a United States Magistrate. Based on the pleadings, the testimony of witnesses, and other evidence, the magistrate filed a detailed memorandum of findings of fact and conclusions of law. The findings of fact are not contested by appellant. The magistrate ordered the case dismissed and judgment entered for the defendants. Appellant has filed a timely appeal.

The reason the TDC officials refused to permit the delivery of the May-June issue of Torch-La Antorcha was because on its second page the issue printed three letters which the officials concluded "contain[ed] material that a reasonable person would construe as written solely for the purpose of communicating information designated to achieve a breakdown of prisons through inmate disruption such as strikes or riots." The common characteristic of these three letters was to characterize blacks and chicanos as racial minorities opposed by and subject to violence imposed by "whites". Probably the most inciting of these three articles was entitled Texas Prisoners Oppose Klan Organizing. It reported that some of the prisoners of the Ellis Unit

were organizing a Ku Klux Klan chapter with the encouragement of the prison guards. There were further allegations that the prison guards discriminated against chicanos on work details. Finally, it concluded, "I feel if anything cuts loose the guards will make sure the KKK inmates have some good knives and make sure the chicanos have none."

The second letter was entitled Racial Crime at Clinton. It was a letter from a black mother whose son is incarcerated in a New York State prison facility. The entire letter was devoted to claims that the guards and officials engage in all kinds of conduct to "dehumanize" blacks. It went on to claim that her son was obviously in danger and that the official policy was to subordinate black inmates to the "white race". It concluded that she and other relatives of the black inmates were determined to expose to the world the racist crimes being committed against black inmates.

The third letter was from a prisoner in the Ellis Unit of the TDC. It was a long letter concerning discrimination against chicanos by whites and by both political parties. It characterized the United States Constitution as elitist, having been written by and protecting only "the rich". Calling the chicano movement "the sleeping giant" the letter concluded "let the Sleeping Giant awaken and let's all struggle together for a better society. A society with no bigots.... A society free from murdering pigs.... Until victory."

Taken in isolation and in a calm background, these letters while encouraging racial hatred nevertheless could be seen as falling into a pattern of no more than radical rhetoric. The officials of TDC, however, saw these articles as a potential spark which could ignite a "powder keg situation". At the time of the censorship and immediately prior thereto there had existed a period of serious unrest at the TDC. The magistrate made this finding of fact which we must conclude on the record is not clearly erroneous:

The period preceding May of 1979 had been a period of unrest at the Texas Department of Corrections. In October of 1978 the Coffield Unit had been taken by inmates. There was a potential for riots. A work stoppage had taken place at the Darrington Unit. At the Ellis Unit there were sitdown strikes and the inmates there had occupied what is known as the turnout yard.

The magistrate also found that additional unrest was created because this time period coincided with the opening of extensive testimony in *Ruiz v. Estelle,* which was a major class action suit by TDC inmates challenging conditions of confinement at the Texas Department of Corrections. That suit later culminated in comprehensive class-wide injunctive relief in favor of the plaintiff prisoner class. *Ruiz v. Estelle,* 503 F.Supp. 1265 (S.D.Tex.1980), *aff'd in part and rev'd in part,* 679 F.2d 1115 (5th Cir.), *amended in part,* 688 F.2d 266 (5th Cir.1982), *cert. denied,* 460 U.S. 1042, 103 S.Ct. 1438, 75 L.Ed.2d 795 (1983).

■ In view of the established turmoil in the Texas Department of Corrections immediately preceding and during the time that this episode of censorship took place, we cannot find erroneous the magistrate's conclusion that the censorship was justified to avoid a perceived threat to prison security. It is clear that the appellees' objection in this case was not to the general use of radical rhetoric. They stipulated that none of the rest of the articles in the particular issue were objectionable and yet perusal of the exhibit shows that radical rhetoric was rife throughout. Instead, the officials acted under a specific concern of possible incitement to violence. We must not undertake to second guess the discretion of prison officials in cases when their subjective concerns, not shown to be in bad faith, are supported by proven objective factors. Such is the situation here.

■ The fact that only one page of the seventeen page English portion of the publication contained the censored material raises the other major issue advanced by appellant Hernandez. It is his contention

that the offending articles should have been clipped but that the rest of the publication should have been allowed to be delivered to him and to the other inmates. The contention is that it "was clear error for the trial court to have concluded that appellant's First Amendment freedoms were not violated by wholesale censorship of the entire publication when only certain portions were objectionable." The district court concluded that the failure of the prison officials to clip the objectionable portions and allow the rest to be distributed, even if it was an improper action, it was not of "constitutional magnitude".

Regulations have since been drawn in response to the *Guajardo* decision which require clipping the offensive material in carefully defined circumstances so as to avoid the overbreadth objection. A general constitutional obligation to clip would raise serious practical questions. Sheer amounts of such materials and sheer numbers of the publications to be clipped obviously are significant factors. It is well to note that the procedure for clipping under the regulations which have been drawn go into effect only after a challenge to the prohibition against distribution of the entire publication has been made.

We need not draw any conclusion with respect to the constitutional requirement of clipping in this particular case, however, because the defendants prevailed in the district court on their affirmative defense of qualified immunity. The immunity holding is correct. The defendants took their actions within the scope of their discretionary authority and acted in the course of their official responsibilities. Certainly at the time the action was taken the development of the principles of the free speech rights of prisoners was not at the stage where we must conclude that the officials who banned the distribution of the entire publication moved beyond the immunity to which they were entitled.

The leading case on this issue is *Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). In that case the Court held that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate *clearly established* statutory or constitutional rights of which a reasonable person would have known." 457 U.S. at 818, 102 S.Ct. at 2738 (emphasis added). The law as to the free speech rights of prisoners is developing. Neither party cites us to any case in which there is a specific holding that prisoner censorship of the distribution of publications requires clipping of the offensive material and distribution of the rest. Our own leading case establishing the free speech guidelines, *Guajardo v. Estelle, supra,* did not resolve the limitations on censorship by requiring clipping until the stipulated settlement of that case in 1983. And the settlement placed limits on the obligation to clip. Further, the settlement in that case does not constitute a holding that clipping is constitutionally required.

In view of these considerations, the magistrate correctly concluded that the appellees in failing to narrow the scope of censorship by clipping the offending items were not violating as of 1979 "clearly established law." Under their qualified immunity, therefore, they were entitled to a judgment finding no liability in damages for failure to narrow the scope of censorship by clipping the banned items.

■ Appellant also makes the claim that appellees are responsible to him in damages because of their failure to comply with the time limit in the regulations under which an inmate is notified that a publication is being withheld from him or her.

Inmate Martha Quinlin was the first inmate denied the particular issue of Torch-La Antorcha. She received notification on May 18, 1979. She filled out the requisite disposition form requesting that the publication be sent to the attorney in the *Guajardo* case. She also appealed the warden's decision to the Director's Review Committee. The Director's Review Committee upheld the warden's decision on May 22, 1979. On that date the Director's Review Committee issued an interoffice communication to all TDC wardens notifying them a final decision had been reached concerning

that particular publication and certain other previously rejected publications. It was not until seven days later, on May 29, 1979, that appellant was notified as to the disposition concerning this particular publication. At the time of this occurrence the regulations of the TDC governing prisoner publications provided that an inmate should be notified within 48 hours, in writing, and in person, that a publication was being withheld.

Appellant's claim is that his constitutional rights were violated because the 48 hour requirement of the rules in effect at that time was not met. The claim is that the mere failure of the TDC officials to follow their regulations was a constitutional violation. There is no such controlling constitutional principle. Appellant relies upon *Hardwick v. Ault*, 447 F.Supp. 116 (M.D. Ga.1978). But the statement in that case that "prison officials must follow scrupulously their own regulations" does not establish that failure to follow any regulation constitutes a civil rights violation. In *Vodicka v. Phelps*, 624 F.2d 569, 575 (5th Cir. 1980), this Court clearly implied that a violation of the regulation on notification would not automatically entitle a prisoner to § 1983 relief. The case is not controlling because the facts are different, but the implication is there.

Whatever remedies by way of damages appellant might have against the state in state court, the controlling factor is that we have jurisdiction only over claims of constitutional violations, and the mere failure to give notice in time, but with complete and adequate due process procedures after the notice actually was given, cannot be taken as establishing a violation of the United States Constitution.

Finally, appellant contends the district court was in error in holding that his claim for equitable relief was barred by the doctrine of res judicata. At the pretrial hearing, however, appellant entered into an agreement with the other parties that his request for declaratory judgment and for injunctive relief were both barred by the class action suit in *Guajardo*. Thus, it was not necessary for the district court to rule on this issue. Appellant as a member of the class in *Guajardo* was bound by the decision and did have the right to protest the proposed settlement in that case by filing his objections in writing before April 18, 1983. He had ample opportunity to do so, therefore, since this suit was filed in 1979.

We find no error in the findings of fact and conclusions of law of the district court.

AFFIRMED.