**Susan TINSLEY**

v.

**Thomasette PITTARI, Chaplain, Bureau of Prisons, FMC–Carswell**

**No. 4:95–CV–907–E.**

United States District Court,
N.D. Texas,
Fort Worth Division.

Oct. 1, 1996.

Susan Tinsley, Cleburne, TX, Pro Se.

William J. Andersen, U.S. Attorney's Office, Fort Worth, TX, for Thomasette Pittari.

## MEMORANDUM OPINION AND ORDER

MAHON, District Judge.

Defendants Thomasette Pittari and Daryl Desjardin have moved for dismissal of or summary judgment on Plaintiff Susan Tinsley's claims. For the following reasons, the Court grants the motion.

### I. BACKGROUND

In August 1993, a federal court sentenced Tinsley to imprisonment based on her convictions for mail fraud and conspiracy to commit mail fraud, wire fraud and money laundering. Since at least January 1995, she has been a federal prisoner incarcerated at the Federal Medical Center (FMC), Carswell, Fort Worth, Texas.

On March 21, 1995, Tinsley submitted a written request to the Chaplain's Office at FMC–Carswell, stating that she was "a Christian whose faith is practiced according to the tenets of the early Christian church." Tinsley stated that she celebrated Passover, the feast of unleavened bread, but that, as an "orthodox Christian," her calendar was a lunar rather than solar one. According to that calendar, she indicated, Passover would begin at 6:00 p.m. on March 30, 1995, and a "double sabbath" also beginning at that time would end at 6:00 p.m. on Saturday, April 1, 1995. Tinsley stated that it was required that no work be performed during this 48–hour period and requested that she therefore be relieved from her job duties for one day, that is, Friday, March 31, 1995.[1] In support of the request, Tinsley included two documents, one which she represented was a portion of a letter from her pastor, whom she stated was her codefendant, the other which consisted of two pages from the transcript of her trial in which someone named White spoke of determining the date of Passover by the full moon.[2] The letter, which contained

---

1. Tinsley apparently had the Saturday off as part of her normal work schedule.

2. Taken together, other evidence in the record indicates that White was Tinsley's codefendant, Melvin White, who was an inmate in a different

no signature or other indication of the author, referred to the full moon in March and stated that Passover was on March 30 in the evening through the 31st.

Defendant Pittari, the chaplain to whom the request was assigned, spoke with her supervisor, who informed her that the Regional Office (of the Bureau of Prisons (BOP)) said Tinsley's religious group was not listed for any work proscription days. Pittari then responded to Tinsley in writing that the days Tinsley sought to be off were not approved religious work proscription days as listed by the Central Office. Consequently, Pittari stated, she could not approve those days. According to Pittari, however, she verbally explained that if Tinsley wished to establish her faith as a recognized religion, she would have to pursue certain procedures. These required the provision of documentation regarding who the leader of the religion was, how the church was organized and any church references mandating the dates she requested as work proscription days. Such documentation would be forwarded to the Regional and Central Offices of BOP.

Tinsley was able to arrange with her work supervisor to take March 31, 1995 off in exchange for working an extra day. Having received the immediate result she sought, she chose not to seek an administrative remedy with regard to recognition of her religion or of the work proscription days involved therewith.

In early February 1996, Tinsley again submitted a request regarding work relief during Passover and the feast of unleavened bread. This time she sought an entire week off, from March 18th to the 25th, rather than a single day.[3] Again, Pittari noted that the days in question were not approved religious proscription days. Pittari reminded Tinsley of the procedures for establishing a recognized religion, which included providing documentation that would be forwarded to the Regional and Central Offices of BOP.

On February 22, 1996, apparently following up on Pittari's advice on how to receive recognition for a new religion, Tinsley submitted a request form accompanied by the same letter and trial transcript she had included with her request for work relief the year before. Pittari responded that any additional information should be submitted by March 4, 1996, after which the chaplains would prepare the information for submission to the Central Office. On March 13, 1996, Pittari forwarded Tinsley's information to the Warden, who forwarded it the next day to the Director of the South Central Region.[4] On May 1, 1996, the Warden sent the Director an additional memorandum. He noted that Tinsley's attempt to identify an outside religious authority was limited to her citation of statements of a BOP inmate housed at another institution. In addition, research conducted by the BOP's Religious Services Department failed to show any linkage between Tinsley's requested religious practice and the holy day requirements of denominations identified as traditional Christian Orthodox. Consequently, he recommended that Tinsley's future requests for days off from work for similar reasons be denied. There is no evidence in the record regarding the ultimate decision on Tinsley's request for recognition of her faith or, more particularly, the work proscription dates of Passover.

Although her request for relief from work had not been approved as of March 20, 1996, Tinsley refrained from going to work at that time. She was told to go to work. When she refused to do so, she was placed in a segregation unit. While in the unit, Tinsley did not receive a pork-free diet or flour tortillas as she requested. On March 25, 1996, the Unit Disciplinary Committee held a hearing on Tinsley's case and found that she had improperly refused to work. The Committee restricted Tinsley to her quarters for 30 days.

federal prison. Tinsley's request did not make this fact clear, however.

**3.** None of the parties has included the February 1996 request in their summary judgment evidence, thus preventing the Court from knowing its exact terms. The general nature of the request is discussed in other documents in the record.

**4.** Pittari's memorandum accompanying Tinsley's request noted that BOP records showed Tinsley's religious preference as Protestant.

On April 11, 1996, Tinsley submitted a memorandum to Religious Services, requesting advice as to the status of her February 6, 1996 request for holy day observances. She stated that her next observance would be the Feast of Booths (Tabernacles), September 10th through 18th. Pittari responded that the dates in question were not listed as recognized holy days by the BOP and that the chaplains had not yet received a reply to Tinsley's request for her religious group to be recognized. On May 3, 1996, Tinsley submitted a memorandum stating that she had erred earlier and that the Feast of Booths was observed from September 9th through 16th.

Tinsley filed this action in December 1995, naming Pittari as defendant. She asserted that Pittari's denial of her March 1995 request for a work day off violated her right to the free exercise of religion and equal protection, as well as the Religious Freedom Restoration Act of 1993 (RFRA). Although Tinsley admitted she had not exhausted BOP administrative remedies and stated she sought only monetary damages, elsewhere in the complaint she also requested declaratory relief. In April 1996, Tinsley filed a motion seeking injunctive relief with respect to holy days she wished to observe in September 1996. In June 1996, she amended the complaint, adding as defendant Daryl Desjardin, a second chaplain at FMC–Carswell. She alleged that Desjardin had refused to approve her request for non-pork meals and unleavened bread (in the form of tortillas) while she was subjected to 24–hour lockdown. She now asserted claims for violation of equal protection, due process and the Eighth Amendment, the latter claim based on her lockdown in solitary confinement during the period she was segregated after refusing to work. Defendants responded to the amended complaint with a renewed motion for dismissal or summary judgment. The parties' briefing on this motion was completed on August 21, 1996. Defendants have stated that Tinsley is scheduled to be released from imprisonment on about September 27, 1996.

## II. ANALYSIS

Defendants have moved to dismiss Tinsley's claims or, alternatively, for summary judgment. Because the parties have introduced evidence outside the pleadings, which the Court has considered, the motion is treated as one for summary judgment. Fed. R.Civ.P. 12(b).

### A. Summary Judgment Standard

In order to prevail on a motion for summary judgment, the moving party has the initial burden of demonstrating that there is no genuine issue as to any material fact and that judgment should be entered as a matter of law. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986); Fed.R.Civ.P. 56(c). Once the moving party has made an initial showing, the party opposing the motion must come forward with competent summary judgment evidence establishing a genuine fact issue. *Anderson,* 477 U.S. at 257, 106 S.Ct. at 2514. *See also Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 585–87, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986). If the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to her case and on which she will bear the burden of proof at trial, summary judgment must be granted. *Celotex,* 477 U.S. at 322–23, 106 S.Ct. at 2552.

### B. Monetary Relief

Tinsley seeks monetary damages for defendants' alleged violations of her constitutional and statutory rights. She sues defendants in both their official and individual capacities.

#### 1. Official capacity claims

■ Tinsley's right to seek damages from defendants based on alleged constitutional violations derives from *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971). In *Bivens,* the Supreme Court held that the plaintiff was entitled to recover damages for any injuries suffered as a result of federal agents' constitutional violations. *Id.* at 397, 91 S.Ct. at 2005. Howev-

er, the right of action implied in *Bivens* applies only against federal agents in their *individual* capacities. The United States and its officers acting in their official capacities remain protected by sovereign immunity. *See Williamson v. U.S. Dept. of Agriculture,* 815 F.2d 368, 380 (5th Cir.1987). Hence, Tinsley's constitutional claims for damages must be dismissed against defendants in their official capacities.

■ The Court concludes that Tinsley's claim for damages under the RFRA also cannot survive against defendants in their official capacities. An official-capacity suit is an alternative method of suing the entity of which the officer is an agent. *Kentucky v. Graham,* 473 U.S. 159, 165, 105 S.Ct. 3099, 3105, 87 L.Ed.2d 114 (1985). In this case, then, Tinsley's claims against defendants in their official capacities are in reality claims against the BOP, an agency of the United States.

■ It goes almost without saying that the United States is immune from suit for damages except in those limited circumstances where it has consented to be sued. A waiver of the federal government's sovereign immunity must be unequivocally expressed in statutory text. *Lane v. Pena,* —— U.S. ——, ——, 116 S.Ct. 2092, 2096, 135 L.Ed.2d 486 (1996). To hold the government liable for monetary damages, the waiver of sovereign immunity must extend unambiguously to monetary claims. *Id.* at —— – ——, 116 S.Ct. at 2096–97.

The RFRA provides that:

A person whose religious exercise has been burdened in violation of this section may assert that violation as a claim or defense in a judicial proceeding and obtain appropriate relief against a government.

42 U.S.C. § 2000bb–1(c). Although § 2000bb–2(1) makes clear that "government" includes a branch, department, agency or official of the United States, § 2000bb–1(c)'s reference to "appropriate relief" is not the kind of unambiguous waiver necessary to subject the United States to liability for damages. Nor does any other language in the RFRA purport to waive the federal government's sovereign immunity from monetary claims. *See Rust v. Clarke,* 851 F.Supp. 377, 380–81 (D.Neb.1994) (§ 2000bb–1(c) does not unequivocally waive states' immunity from monetary claims under the Eleventh Amendment). Thus Tinsley's claim under the RFRA must be dismissed insofar as it is asserted against defendants in their official capacities.

2. *Individual capacity claims*

Defendants have raised the defense of qualified immunity in response to Tinsley's claims for damages against them in their individual capacities. Qualified immunity protects government officials performing discretionary functions from personal liability as long as their conduct does not violate clearly established constitutional or federal statutory rights. *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). To overcome such officials' immunity from suit, the right allegedly violated must be "sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987).

■ In considering the individual defendants' entitlement to qualified immunity, the Court initially must determine whether Tinsley has asserted a violation of a constitutional or statutory right at all. *See Siegert v. Gilley,* 500 U.S. 226, 231, 111 S.Ct. 1789, 1793, 114 L.Ed.2d 277 (1991); *Ganther v. Ingle,* 75 F.3d 207, 210 (5th Cir.1996). The Court need go no further if she has failed to produce evidence that the individual defendants violated a clearly established right. *Hassan v. Lubbock Indep. Sch. Dist.,* 55 F.3d 1075, 1079 (5th Cir.), *cert. denied,* —— U.S. ——, 116 S.Ct. 532, 133 L.Ed.2d 438 (1995). If a violation is shown, the Court must determine whether defendants' conduct was reasonable in light of clear legal rules existing at the time of the events in question. Thus, even assuming a violation of Tinsley's rights, defendants are immune from liability if reasonable public officials could have differed on the lawfulness of their conduct. *Id.*

a. *Freedom of religious exercise*

Tinsley asserts claims under both the First Amendment and the RFRA. Prior to enact-

ment of the RFRA, the Supreme Court held that prisoners' First Amendment rights were limited by the nature and requirements of their incarceration, and that prison regulations impinging on those rights were valid if reasonably related to legitimate penological interests. *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 350, 107 S.Ct. 2400, 2404, 96 L.Ed.2d 282 (1987). Under *O'Lone*, the reasonableness of a given regulation depends on several factors: (1) whether there is a logical connection between the regulation and the legitimate government interests invoked to justify it; (2) whether the regulation leaves prisoners other means of participating in their religious practices; and (3) the impact accommodation of prisoners' rights would have on other inmates, on prison personnel and on allocation of prison resources. *Id.* at 350–52, 107 S.Ct. at 2405–06.

Passed in 1993, the RFRA provides that:
§ 2000bb–1. **Free exercise of religion protected**
**(a) In general**

Government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability, except as provided in subsection (b) of this section.

**(b) Exception**

Government may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person—

(1) is in furtherance of a compelling governmental interest; and

(2) is the least restrictive means of furthering that compelling governmental interest.

The threshold question under the RFRA is whether the regulation or conduct in question substantially burdens the plaintiff's religious practice. *Hicks v. Garner*, 69 F.3d 22, 26 n. 22 (5th Cir.1995). To date, the Fifth Circuit has not defined what constitutes a "substantial burden." Indeed, in November 1995, the Fifth Circuit recognized that the

RFRA was relatively new law, with its statutory contours vague and its legal limits and standards yet to be defined. *Id.* It is not clear to what extent the pre-RFRA analysis of First Amendment claims survives and is independent of the RFRA. *See Mack v. O'Leary*, 80 F.3d 1175, 1181 (7th Cir.1996) (noting that statute such as RFRA cannot enlarge or contract Constitution, and indicating generally that pre-RFRA free exercise analysis still has some validity); *Hicks*, 69 F.3d at 25–26 (applying both analyses where claims were made under both the First Amendment and the RFRA).

### (1) Pittari

Tinsley's free exercise claim against Defendant Pittari rests on the latter's failure to approve a day off from work in March 1995 and a week off in March 1996. Tinsley characterizes Pittari's actions as the denial of the right to observe holy days by refraining from work, a practice Tinsley now contends is a central tenet of her religion. Without determining whether Tinsley has stated a constitutional violation under current law, the Court turns to the second step of the inquiry, where Pittari's right to qualified immunity turns on the law and facts as they were at the time of her challenged conduct. *Ganther*, 75 F.3d at 210–11.

As Tinsley concedes, Pittari did not make any determination regarding whether Tinsley's purported religious beliefs were held in good faith or whether such beliefs truly required that Tinsley refrain from work on the dates in question. Rather, Pittari merely determined that the requested dates were not included among those currently recognized by the BOP as legitimate work proscription dates, and notified Tinsley that she therefore could not approve them as work proscription days. Pittari attests that she informed Tinsley of the need to seek BOP recognition for her religion, first in March 1995 and again in February 1996. Tinsley's affidavits do not dispute that she was so informed in March 1995.[5] In fact, Tinsley

---

5. In her brief opposing Pittari's original motion to dismiss, Tinsley states that Pittari did not advise her how to establish her faith as a recognized religion until February 1996. Tinsley has

not included this statement in her affidavits, however, and, as discussed below, the Court finds that even if Pittari failed to so advise her in

admits that when she was able to arrange with her supervisor to take off the day in question, she "elected" not to seek an administrative remedy. Tinsley also does not dispute that Pittari again informed her of the need to obtain recognition for her religion in February 1996. At the latter time Tinsley initiated a request for recognition, if not for her religion in general, then at least for the specific work proscription days involved in Passover and the feast of unleavened bread. Pittari made no decision or recommendation as to whether Tinsley's request for recognition should be granted, but simply assembled and summarized in a memorandum Tinsley's evidence regarding her claimed religion.

■ The undisputed evidence establishes that Pittari simply followed BOP policy, which, as she understood it, required recognition of a religious practice by the Central Office of BOP before an individual chaplain such as Pittari could approve work proscription days based on that practice.[6] There is no evidence that Pittari authored the policy or believed she had any discretion in applying it. Under the policy, an inmate professing a nontraditional religion was not prevented from engaging in the practices of her chosen religion, but merely was required, prior to receiving special accommodation for those practices, to establish the good faith nature of her beliefs.

■ To overcome Pittari's right to qualified immunity, Tinsley would have to show that established law made it clear at the time of Pittari's conduct that a policy like that of the BOP violated prisoners' free exercise rights. However, Tinsley has pointed to no

authority mandating that prison officials grant benefits such as work proscription days to inmates who claim to follow unfamiliar religions without first establishing the bona fide nature of the inmates' beliefs. Indeed, courts have consistently recognized that some determination of the sincerity of an individual's proclaimed religious beliefs must be made before she can become entitled to First Amendment protections. *See e.g.,* *Wisconsin v. Yoder,* 406 U.S. 205, 215–16, 92 S.Ct. 1526, 1533, 32 L.Ed.2d 15 (1972); *Theriault v. Carlson,* 495 F.2d 390, 394–95 (5th Cir.), *cert. denied,* 419 U.S. 1003, 95 S.Ct. 323, 42 L.Ed.2d 279 (1974). Although permitting local chaplains to make the initial determination of good faith might give BOP prisoners more immediate relief, a centralized procedure is less likely to be affected by personal relationships or to result in inconsistencies between the handling of different cases. Considering the flexible *O'Lone* standard and the still undefined contours of the RFRA, the Court concludes that nothing at the time of Pittari's conduct suggested, much less established, that she was required to approve Tinsley's requests regardless of BOP policy delegating the decision regarding sincerity to a higher level.[7] There being no evidence that Pittari acted unreasonably or contrary to clear constitutional or statutory rights, she is entitled to qualified immunity on Tinsley's free exercise claims seeking damages.[8]

### (2) Desjardin

Tinsley's free exercise claim against Desjardin is based on his alleged refusal to ap-

March 1995, that failure would not destroy her qualified immunity.

6. Tinsley concedes this fact when, in the amended complaint, she states that "Bureau of Prison regulations were the moving force and contributed in the violations of Plaintiff's constitutional and statutory rights."

7. In this regard, it is worth noting that Tinsley's conscious decision not to pursue recognition of her religion in 1995, thereby leaving Pittari with no option but to withhold approval again in 1996, is not attributable to Pittari and does not establish she had reason to believe the BOP procedure was so unreasonably lengthy as to be a clear violation of free exercise rights.

8. The Court would not reach a different conclusion even if Pittari failed to advise Tinsley of the procedures for establishing her religion when Tinsley first requested time off in March 1995. Pittari's response to Tinsley's request made it clear that the reason approval was not being given was that Tinsley's requested days off were not approved work proscription days as determined by the Central Office. Thus it was sufficiently clear that Tinsley must take steps to establish the validity of her chosen days with the Central Office. Further, Pittari's failure to advise Tinsley, not having been alleged to be intentional, does not arise to the violation of a known constitutional or statutory right.

prove her request for non-pork meals and tortillas while she was in segregation after having refused to go to work in March 1996. Desjardin denies Tinsley ever made such a request, but states that she would not have been entitled to tortillas in any case since her religious practices had not yet been approved. Desjardin also states that if Tinsley had sent a request directly to Food Services, she ordinarily would have been given non-pork meals.

Tinsley attests that while in segregation she spoke with Desjardin about the dietary requirements of her faith and that he said he could not order tortillas or non-pork meals for her on a religious basis. However, he said he would talk to Food Services and see if they would informally comply with her requests. According to Tinsley, a Food Services foreman visited her the next day, apparently because Desjardin had spoken to him. Yet, although the foreman indicated he would honor her requests, he in fact never did so.

■ Even accepting the facts as represented by Tinsley, the Court finds Desjardin is entitled to qualified immunity. As with Pittari, the evidence shows that Desjardin believed he had no discretion to grant Tinsley's requests, but had to rely on the fact that her nontraditional religion had not yet been recognized administratively. For the reasons given above with respect to Pittari, Desjardin's following of BOP policy did not violate clearly established law.

### b. Due process

■ The complaint alleges that Tinsley's right to due process was violated "when denial of the right to observe her religious holy days was imposed without determination of [the] least restrictive means/compelling interest test." The evidence shows, however, that the substantive decisions regarding the sincerity of Tinsley's religious beliefs and her consequent right to special dispensations in order to observe certain holy days were not delegated to or made by defendants. Defendants' withholding of approval for Tinsley's requests was done without prejudice to her pursuing recognition of her religion through administrative channels. The Court concludes that neither defendant violated clearly established law regarding Tinsley's due process rights.

### c. Equal protection.

■ Tinsley contends she was denied equal protection because she was not permitted to observe holy days in the same manner as inmates of traditional religions. This claim may best be characterized as one under the free exercise clause. See Cruz v. Beto, 405 U.S. 319, 322, 92 S.Ct. 1079, 1081–82, 31 L.Ed.2d 263 (1972) (state's denial to prisoner of opportunity to observe his faith comparable to inmates of more conventional religions would be violation of First Amendment free exercise clause); Mack, 80 F.3d at 1181 (same). To the extent the claim is so construed, defendants' previously-established entitlement to qualified immunity is applicable.

■ The outcome is the same under a Fourteenth Amendment analysis. Mere differences in treatment do not make out a denial of equal protection. Griffin v. County School Bd. of Prince Edward County, 377 U.S. 218, 230, 84 S.Ct. 1226, 1233, 12 L.Ed.2d 256 (1964). To succeed in an equal protection claim, Tinsley would have to show that she was treated differently than persons who were in all relevant respects alike. See Nordlinger v. Hahn, 505 U.S. 1, 8–10, 112 S.Ct. 2326, 2331, 120 L.Ed.2d 1 (1992); Mahone v. Addicks Utility Dist. of Harris County, 836 F.2d 921, 932 (5th Cir.1988).

The evidence shows defendants believed Tinsley was not like inmates of more traditional religions in that she had not yet received recognition for her religious beliefs or the holy days involved. Defendants understood there was a procedure through which Tinsley could receive recognition, after which she could be approved for work proscription days and a religious diet. The Court is aware of no case law that would have notified defendants that their differential treatment of Tinsley pending her pursuit of administrative recognition of her beliefs violated Tinsley's equal protection rights. Hence defendants are entitled to qualified immunity on Tinsley's equal protection claim.

### d. *Cruel and unusual punishment*

 Tinsley asserts that her Eighth Amendment right to protection from cruel and unusual punishment was violated when she was placed in solitary confinement and on room restriction in retaliation for her religious beliefs. Notably, Tinsley does not allege that defendants were involved in any way in imposing the challenged discipline. Nor does the summary judgment evidence demonstrate that either defendant initiated, participated in or was otherwise responsible for the discipline of which Tinsley complains. Because Tinsley has not raised a question of fact as to whether either defendant was involved in the violation of her Eighth Amendment rights, defendants are entitled to summary judgment on this claim. *See Thompson v. Steele,* 709 F.2d 381, 382 (5th Cir.), *cert. denied,* 464 U.S. 897, 104 S.Ct. 248, 78 L.Ed.2d 236 (1983) (personal involvement is an essential element of a civil rights cause of action).

### C. *Declaratory and Injunctive Relief*

Despite the complaint's statement that Tinsley seeks only monetary damages, the original complaint requests that the Court "[d]eclare the violation as stated in this Complaint as unconstitutional" and Tinsley has indicated in response to defendants' motions that she does seek declaratory relief. In addition, Tinsley has filed a motion, subsequently renewed, requesting a preliminary injunction.

Defendants have sought dismissal of all Tinsley's claims based on her admitted failure to exhaust administrative remedies. In *McCarthy v. Madigan,* 503 U.S. 140, 112 S.Ct. 1081, 117 L.Ed.2d 291 (1992), the Supreme Court held that a federal prisoner asserting a *Bivens* claim for monetary damages only was not required to exhaust BOP administrative remedies prior to filing suit in court. One of the primary bases for its conclusion was the unavailability of monetary relief through the administrative process. *Id.* at 152–56, 112 S.Ct. at 1090–92. *McCarthy* did not rule out the requirement of exhaustion where injunctive or declaratory relief were also sought. *See id.* at 153 n. 5, 112 S.Ct. at 1091 n. 5.

Subsequent to *McCarthy,* the Fifth Circuit has held that a federal prisoner seeking only injunctive relief must exhaust administrative remedies before filing suit in court. *Rourke v. Thompson,* 11 F.3d 47, 50 (5th Cir.1993). Under *Rourke,* dismissal is appropriate where such a prisoner has failed to exhaust BOP remedies. *Id.*

*Rourke* did not involve a mixed claim for both monetary and injunctive relief, and expressly refrained from deciding whether exhaustion would be required in such a case. *Id.* at 50 n. 9. In *Arvie v. Stalder,* 53 F.3d 702 (5th Cir.1995), however, the Court addressed the question left open in *Rourke* in the context of a state prisoner's § 1983 claim for monetary and injunctive relief. *Arvie* held that exhaustion was required in the case of such mixed claims. *Id.* at 706. Although *Arvie* involved § 1983 rather than *Bivens* claims, the Court noted its approval of the reasoning in two Eleventh Circuit cases which had applied a similar exhaustion requirement where *Bivens* claims for both monetary and injunctive relief were asserted. *Id.*

Under the reasoning in *Arvie,* the Court could have dismissed all of Tinsley's claims. Nevertheless, because the undisputed facts (or, in the case of dispute, those alleged by Tinsley) showed that summary judgment is warranted on Tinsley's monetary claims, the Court chose to dispose of those claims. At this point, only the claims for declaratory and injunctive relief remain for determination. With respect to those claims, *Arvie* and *Rourke* weigh in favor of dismissal.

 Tinsley argues against an exhaustion requirement, alleging that the BOP's administrative procedures are not quick enough to afford her effective protection for her religious beliefs and that the government is biased against her, thus making resort to the procedure futile. With regard to the timeliness of the BOP procedures, Tinsley points to the fact that her 1995 request for a work proscription day had not been resolved by April 1996. However, Tinsley admits that after Pittari notified her in 1995 that she could not approve the day requested, Tinsley took no further steps to

**394**

get relief as to that request through BOP administrative procedures. Hence there was in fact no request pending for the BOP to act on. Tinsley's argument about futility is also without force. She contends that because defendants' motion questions the sincerity of her religious beliefs, it can be assumed that any attempt to exhaust administrative remedies would necessarily result in a determination that she is not sincere. Tinsley has produced no evidence, however, that defendants' personal view of her sincerity has any bearing on the administrative decision whether to recognize her religious beliefs. Absent evidence that administrative remedies would be ineffective or futile in Tinsley's case, the Court concludes that exhaustion should be required.[9]

## III. CONCLUSION

Based on the foregoing, the Court ORDERS that defendants' motion to dismiss or for summary judgment is GRANTED as follows. Tinsley's claims for damages are dismissed with prejudice against defendants in both their individual and official capacities. Tinsley's claims for declaratory and injunctive relief are dismissed without prejudice.

---

**9.** Tinsley's requests for declaratory and injunctive relief would almost certainly have to be dismissed in any event. The holy days for which she sought injunctive relief were to occur on September 9 through 16, 1996, and those days have now passed. She is scheduled to be released from custody on about September 27, 1996. To the extent she seeks relief only as to *past* conduct that allegedly violated her constitutional rights, there is no present continuing actual controversy permitting the Court to grant a declaratory judgment. *See Johnson v. Onion,* 761 F.2d 224, 225 (5th Cir.1985). To be entitled to declaratory relief, Tinsley would have to allege that the challenged conduct is continuing or will be repeated in the future. *Id.* Once she is released, this requisite will be missing and her

claim for declaratory relief will be moot. *See Gillespie v. Crawford,* 858 F.2d 1101, 1103 (5th Cir.1988) (claim for declaratory relief moot where prisoner challenging conditions of confinement had been released). Similarly, injunctive relief regarding the September holy days would no longer be of any use and, upon her release, Tinsley's request for injunctive relief will be moot. *Wallace v. Texas Tech Univ.,* 80 F.3d 1042, 1047 n. 3 (5th Cir.1996) (claim for injunctive relief moot where there is not reasonable likelihood plaintiff will again be subjected to allegedly unconstitutional actions); *Cooper v. Sheriff, Lubbock County, Texas,* 929 F.2d 1078, 1084 (5th Cir.1991) (request for injunctive relief moot where prisoner was no longer housed in challenged facility).