**Kenneth COLLINS a.k.a. Dawud Malik, TDCJ # 618459**

v.

**Wayne SCOTT, et al.**

**Civil Action No. 6:95cv863.**

United States District Court,
E.D. Texas.

April 18, 1997.

 

Kenneth Collins, Tennessee Colony, pro se.

Karen B. Ray, Assistant Attorney General, Attorney General's Office of Texas, Law Enforcement Defense Division, Austin, for Defendants.

## MEMORANDUM OPINION AND ORDER OF DISMISSAL NUNC PRO TUNC

GUTHRIE, United States Magistrate Judge.

Plaintiff Kenneth Collins a.k.a. Dawud Malik, an inmate confined at the Coffield Unit of the Texas prison system, proceeding *pro se and in forma pauperis,* brings this lawsuit pursuant to 42 U.S.C. § 1983 and 42 U.S.C. § 2000bb. The cause of action was transferred to the undersigned pursuant to 28 U.S.C. § 636(c).

### History of the Case

On May 29, 1996, the Court conducted an evidentiary hearing, as authorized by *Spears v. McCotter,* 766 F.2d 179 (5th Cir.1985), to consider the Plaintiff's claims. The Plaintiff is a Muslim inmate. He complains about a strip search and use of force incident that occurred on September 30, 1995. The Court concluded after the *Spears* hearing that the Plaintiff should be permitted to proceed on a Religious Freedom Restoration Act claim against Captain Milton Arnold and Sergeant Cary Golden. He was also permitted to proceed on an excessive use of force claim against Captain Arnold, Sergeant Golden and Officer Tyde R. Weil. The Plaintiff testified that he is suing Officer Weil for shocking him with an electronic capture shield, which is also known as a Nova shield.[1]

A bench trial was conducted on March 13, 1997. The parties announced ready for the trial. No objections were voiced to the undersigned conducting a bench trial.

### Facts of the Case

The Plaintiff's witnesses consisted of himself, inmate Ahmad All, inmate Asemendes Williams and inmate Darryl Ayers. The Defendants' witnesses were Nurse Tom Seliga, Officer Steven Yates, Captain Milton Arnold, Regional Director James A. Shaw, Jr., and Assistant Warden Kevin Moore. A videotape of the incident was also shown during the trial. It should be noted that the basic facts of the case are not in dispute. The issues in this case are primarily legal in nature.

After considering all of the evidence and testimony, the Court makes the following findings of fact based on the preponderance of the credible testimony and evidence. On September 30, 1995, the Plaintiff attended Muslim religious activities, ate supper and started back to his housing area. He was confined in a close custody section of the Coffield Unit. He approached a gate that led to his housing area. Trainee Sandra Jackson, a female officer, was conducting strip searches of inmates who passed through the gate to the housing area. Strip searches are conducted to make sure that inmates do not have contraband, such as drugs or weapons, in their possession. Strip searches are essential to limit the smuggling of contraband into housing areas. Jackson was the only employee conducting searches at the time. The Plaintiff was ordered to strip naked for a strip search. The Plaintiff asked to be strip searched by a male officer. He explained that his Muslim religious beliefs prohibit him from being naked in front of a female. The Plaintiff acknowledged that his religious beliefs actually forbid him from being naked in front of either males or females. He also stressed that Administrative Directive AD–03.22 states that "[w]hen possible, staff of the same gender should conduct the search. If circumstances dictate that the search must be conducted by staff of the opposite gender, such searches are authorized under this policy only in extraordinary circumstances and approved by the unit warden."

The Plaintiff made a request to talk to Jackson's supervisor. Sergeant Stacy Layton came on the scene. Sergeant Layton

---

1. The term "Nova shield" will be employed throughout the remainder of this opinion.

ordered the Plaintiff to comply with the order to undergo a strip search. He told her that he could not be strip searched by a female because of his religious beliefs. He offered to be strip searched by a male officer. The Plaintiff was placed in a holding cage, which is also known as a legal cage. Sergeant Layton called Sergeant Cary Golden. Sergeant Golden ordered the Plaintiff to strip naked for a search by Sandra Jackson. The Plaintiff again explained that his religious beliefs forbid him from being naked in front of a female. Sergeant Golden's response to the Plaintiff's objections was "bull crap." He emphasized that inmates do not run the prison and that security concerns override religion.

Sergeant Golden telephoned Warden Moore, the warden on duty. He told Warden Moore that an inmate in the holding cage was refusing to obey an order to undergo a strip search. Warden Moore authorized Sergeant Golden to use force to gain compliance. Such force could include the use of the Nova shield. All during this time, inmates were being strip searched in the hallway. A few inmates, such as kitchen workers and support service inmates (SSIs), were permitted through the gate without undergoing a strip search; instead, only a pat down search was conducted. Captain Milton Arnold arrived on the scene. Captain Arnold's initial response was "you again." Earlier in the day, Captain Arnold had helped the Plaintiff go to Muslim religious classes despite problems. The situation was explained to Captain Arnold. Sergeant Golden expressed the opinion that the Plaintiff was simply trying to run the prison system. Captain Arnold eventually told Sergeant Golden to do whatever was necessary to enforce the strip search policy. Captain Arnold left the area.

Sergeant Golden secured the area. A force move team was assembled. Officer Steven Yates was the team leader. Officer Jacob Mitchell was the first person in the team. He held the Nova shield. The Plaintiff was again ordered to undergo a strip search for Sandra Jackson. He took off all of his clothes except for his underwear. He passed his clothes through the slot in the door of the holding cage. He refused to take off his underwear in front of Ms. Jackson. Consequently, the door to the holding cage was opened. The force move team went into the cell. The Nova shield was placed on the Plaintiff and he was shocked. The shield was placed on him for approximately six seconds. The Plaintiff screamed and his body became limp. It is noted that the shield is designed to make a person temporarily lose control over his muscles. The force move team took the Plaintiff out of the holding cage. Restraints were placed around his ankles and wrists. His pants were pulled down to his ankles. Officer Yates conducted the strip search. The Plaintiff's pants were pulled back up. The Plaintiff was carried by the officers to the infirmary. He reported to Nurse Tuskey that he did not have any injuries. She did not observe any injuries. The Plaintiff did not report any injuries from the incident during the days that immediately followed. The Plaintiff notes, however, that he was embarrassed and humiliated. The Plaintiff was placed in prehearing detention. He was disciplined for his behavior during the incident.

*Discussion and Analysis*

The Plaintiff alleges, among other things, that his religious beliefs were violated. He also alleges that the use of force was unnecessary and illegal. He admits that he refused to obey the order to undergo a strip search, but he argues that he was justified in refusing to obey the order because of his religious beliefs and because AD–03.22 specifies that strip searches should be conducted by members of the same sex, if possible. The Plaintiff routinely testified that he is not challenging the strip search policy *per se;* instead, he is complaining that the policy was not followed. The first issue in this case concerns whether prison officials violated the Plaintiff's rights under the Religious Freedom Restoration Act (hereinafter "RFRA") by ordering him to undergo a strip search in front of a female officer.

RFRA, 42 U.S.C. § 2000bb, was enacted on November 16, 1993. In passing RFRA, Congress made the following findings in 42 U.S.C. § 2000bb(a):

1. The framers of the Constitution, recognizing free exercise of religion as an unalienable right, secured its protection in the First Amendment to the Constitution;

2. Laws "neutral" toward religion may burden religious exercise as surely as laws intended to interfere with religious exercise;

3. Governments should not substantially burden religious exercise without compelling justification;

4. In *Employment Division v. Smith*, 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990), the Supreme Court virtually eliminated the requirement that the government justify burdens on religious exercise imposed by laws neutral toward religion; and

5. The compelling interest test set forth in prior Federal court rulings is a workable test for striking sensible balances between religious liberty and competing prior governmental interests.

In § 2000bb(b), Congress went on to explain that the purposes of the Act are:

1. To restore the compelling interest test set forth in *Sherbert v. Verner*, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963) and *Wisconsin v. Yoder*, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972) and to guarantee its application in all cases where free exercise of religion is substantially burdened; and

2. To provide a claim or defense to persons whose religious exercise is substantially burdened by government.

With these considerations in mind, Congress established the standards that are to be employed in cases brought under RFRA in § 2000bb–1:

a. **In general.** Government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability, except as provided in subsection (b).

b. **Exception.** Government may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person—

1. is in furtherance of a compelling governmental interest; and

2. is the least restrictive means of furthering that compelling governmental interest.

It should be emphasized that Congress decided not to make an exception to the act with respect to practices employed by prisons. *See* Congressional Record, § 14350–14368 (October 26, 1993).

The threshold question under RFRA is whether the regulation or conduct in question substantially burdened the Plaintiff's religious beliefs. *Hicks v. Garner*, 69 F.3d 22, 26 n. 22 (5th Cir.1995); *Manley v. Fordice*, 945 F.Supp. 132, 134 (S.D.Miss. 1996). To date, the Fifth Circuit has not defined what constitutes a "substantial burden." *Id.; Tinsley v. Pittari*, 952 F.Supp. 384, 390 (N.D.Tex.1996). However, the Fifth Circuit has noted that the term "substantial burden" has been defined by other circuits in several different ways:

> The religious adherent ... has the obligation to prove that a governmental [action] burdens the adherent's practice of his or her religion ... by preventing him or her from engaging in conduct or having a religious experience which the faith mandates. The interference must be more than inconvenience; the burden must be substantial and an interference with a tenet or belief that is central to religious doctrine. *Bryant v. Gomez*, 46 F.3d 948, 949 (9th Cir.1995); ...
>
> To exceed the "substantial burden" threshold, government regulation must significantly inhibit or constrain conduct or expression that manifests some central tenet of a prisoner's individual beliefs, ...: must meaningfully curtail a prisoner's ability to express adherence to his or her faith; or must deny a prisoner reasonable opportunities to engage in those activities that are fundamental to a prisoner's religion. *Werner v. McCotter*, 49 F.3d 1476, 1480 (10th Cir.1995) (citations omitted).

*Hicks v. Garner*, 69 F.3d at 26 n. 22. After reviewing decisions from other circuits, this Court previously noted that not all burdens are substantial. *Lewis v. Scott*, 910 F.Supp. 282, 286–87 (E.D.Tex.1995). "[T]he very concept of ordered liberty precludes allowing

every person to make his own standards on matters of conduct in which society as a whole has important interests." *Id.* at 287 (*citing Wisconsin v. Yoder,* 406 U.S. at 215–16, 92 S.Ct. at 1533). An adherent must be able to show sincerity and a religious basis of the burdened belief. *Wisconsin v. Yoder,* 406 U.S. at 215–19, 92 S.Ct. at 1533–35. An analysis of what constitutes a substantial burden must also focus on both the degree of the burden placed on an individual and the centrality of the particular practice burdened. *Lewis v. Scott,* 910 F.Supp. at 287.

In the present case, the Court is of the opinion that the Plaintiff has shown that modesty and not showing oneself naked to other people is a sincere belief based on teachings in the Koran. He has not, however, gone the next step in satisfying the centrality requirement. He acknowledged that the Koran specifies that he should not be naked in the presence of males or females, but he is willing to be strip searched by males in all cases and by females in emergency or extraordinary situations. He clearly is willing to comply with orders to be naked in front of others in certain circumstances. His willingness to forego his religious belief in some contexts is one indicator that the belief is not central or fundamental to the religion.

It should be noted that the Court is of the opinion that it is somewhat ironic that the degree in which the Plaintiff is willing to forego his religious beliefs coincides precisely with the provisions of AD–03.22. In other words, he is willing to forego his religious beliefs to the extent that the prison system adheres to administrative policy. The Plaintiff repeatedly testified that his lawsuit is based, in part, on the Defendant's failure to follow the strip search policy found in AD–03.22. In the Report and Recommendation issued after the *Spears* hearing, the Court noted that a violation of a prison regulation, without more, does not state a constitutional violation. *See Hernandez v. Estelle,* 788 F.2d 1154, 1158 (5th Cir.1986). An assertion that prison officials failed to follow departmental regulations must, on its own merit, state a constitutional claim. *See Balli v. Haynes,* 804 F.2d 306, 308 (5th Cir.1986). At various times throughout the trial it appeared that the Plaintiff wanted to proceed on a claim that prison officials violated prison regulations, but the Court is not concerned with possible violations of prison regulations. The Plaintiff must show a violation of federal law. In any event, the Plaintiff's willingness to partially forego his religious beliefs reveals that to him the degree of the burden placed on him by making him strip search in front of others, including females, was not substantial and that the modesty requirement was not central to his religious beliefs.

Moreover, the Plaintiff has not shown that compliance with an order to be strip searched by a female denies him the opportunity to engage in activities that are, in fact, fundamental to his religion. It should also be noted that the Plaintiff acknowledged that the prison system usually accommodated his request to be strip searched by a male. The present situation was a rare exception. An isolated incident of unremarkable proportions does not rise to the level of a constitutional violation. *See James v. Alfred,* 835 F.2d 605, 607 (5th Cir.1988); *George v. King,* 837 F.2d 705, 707 (5th Cir.1988). After reviewing all of these factors, the Court is of the opinion, and so finds, that the Plaintiff has not satisfied his burden of proving that the practice of his religion was substantially burdened.

It should be further noted that the Plaintiff acknowledged that Allah understands the situation. The Plaintiff testified that Allah knows his desire to adhere to the principle of modesty and will not punish him, as long as he expresses his desire to maintain modesty and endeavors to comply with that principle. Undoubtedly, the Plaintiff has clearly endeavored to express his displeasure with being strip searched by females.

Assuming *arguendo* that the Plaintiff had shown that the order to strip search in the presence of females placed a substantial burden on the exercise of his religion, the Plaintiff's claim would still fail because the Defendants have shown a compelling governmental interest in maintaining security and that the strip search practice in the present case was the least restrictive means of furthering that interest. In *Letcher v. Turner,*

968 F.2d 508, 510 (5th Cir.1992), the Fifth Circuit cited with approval the conclusion that "no constitutional violation occurs when naked male inmates are viewed by female guards if the presence of female guards is required to protect a legitimate government interest such as maintaining security at a correctional facility." Regional Director Shaw testified that the prison system has a duty to maintain security. Society expects and demands that prison officials maintain security. The Plaintiff was housed in an area that requires the greatest amount of security, which is close custody. The use of strip searches is essential to make sure that contraband, such as drugs and weapons, are not smuggled into the area. A less extensive type of search would enable inmates to smuggle contraband into the unit and housing areas. Regional Director Shaw testified that he knows of instances where inmates have hidden contraband in their crotches. A strip search is the only means, let alone the least restrictive means, of fully satisfying this security concern.

■ It should be noted that the prison system also has a valid security concern that it will dictate policy. Prisoners cannot be allowed to dictate security policies. It should likewise be noted that prison officials, as opposed to the courts, are the administrators of the prison system and that the courts are only concerned with violations of federal law. *Martinez v. Griffin,* 840 F.2d 314, 314–15 (5th Cir.1988). The need for inmates to comply with orders, as opposed to defying them, is essential for the security of the prison.

The Plaintiff acknowledged that strip searches are necessary, but he does not believe that strip searches by females are generally required. He noted that *Letcher* was decided in the context of a disturbance. He concedes that strip searches by females are constitutionally permissible when an emergency arises, such as in the *Letcher* case. He does not disagree with the prison policy that limits strip searches by females to extraordinary situations. He argued, however, that the prison system routinely employed women to conduct strip searches.

Regional Director Shaw addressed this issue by noting that 30% of the employees in the area were women. He was of the opinion that this fact made the situation extraordinary. The Court is not willing to accept the argument that the fact that 30% of the employees were female made the situation inherently extraordinary. The practice of employing women to conduct strip searches is constitutionally acceptable for an entirely different reason. The practice of assigning women to such positions is governed by a class action lawsuit styled *K.K. Coble, et al. v. Texas Department of Corrections,* Civil Action No. H–77–707–CA, 1982 WL 1578 (S.D.Tex.1982). The Texas prison system may not make distinctions in job assignments based on gender. Prior to the *Coble* case, the prison system universally kept women from being employed and assigned to places where they would come into contact with male inmates. The *Coble* case forced the prison system to discontinue that practice. Regional Director Shaw noted that job assignments were made at the time of the incident without regard to gender, as is required by *Coble.* The Plaintiff may disagree with the decision in *Coble,* but the prison system is governed by it. Consequently, the Court must conclude that the use of strip searches is the least restrictive means of carrying out the legitimate security need of keeping out contraband, such as drugs and weapons, and that the practice of not distinguishing between male and female officers in making job assignments, including the job assignment of conducting strip searches, was mandated by court order.

Regional Director Shaw noted that some refinement of personnel policy has been made since the incident in question to make sure that at least one male employee is on hand to conduct strip searches to accommodate the concerns of inmates such as the Plaintiff. The ability of the prison system to find means to accommodate inmates, such as the Plaintiff, should be commended. The ability to find an accommodation does not, however, undermine the conclusion of the Court that the old practice was the least restrictive means of carrying out policy.

One final issue should be addressed with respect to the RFRA claim. The Plaintiff has noted that the right of privacy and a

right to an accommodation was acknowledged in *Canedy v. Boardman,* 16 F.3d 183 (7th Cir.1994). The *Canedy* decision was made by the Seventh Circuit. A decision by the Seventh Circuit is not controlling in this Circuit. *Letcher, supra,* is the controlling case in the Fifth Circuit. *Letcher* permits females to conduct strip searches of males. In light of the foregoing discussion and analysis, the Court is of the opinion, and so finds, that the Plaintiff has not satisfied his burden of proving that his rights under RFRA were violated.

The second claim litigated at trial involves the use of force against the Plaintiff. The Supreme Court has emphasized that the core judicial inquiry in an excessive use of force claim is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson v. McMillian,* 503 U.S. 1, 6, 112 S.Ct. 995, 999, 117 L.Ed.2d 156 (1992). The Court additionally emphasized that a use of force claim has subjective and objective components. In other words, a court must consider whether the officials acted with a "sufficiently culpable state of mind" and if the alleged wrongdoing was objectively "harmful enough" to establish a constitutional violation. *Id.*

Several factors are important in making an assessment of the situation. The claimant must allege and prove there was an "unnecessary and wanton infliction of pain." In deciding whether the use of force was wanton or unnecessary, a court may consider "the need for application of force, the relationship between that need and the amount of force used, the threat reasonably perceived by the responsible officials, and any efforts made to temper the severity of forceful response." *Id.* (internal quotation and citation omitted). The absence of a serious injury is relevant to but not dispositive of the excessive force claim. *Id.* The Fifth Circuit has instructed the courts in this circuit to consider these five factors in analyzing excessive use of force claims. *Hudson v. McMillian,* 962 F.2d 522, 523 (5th Cir.1992). The Supreme Court additionally emphasized that the concept of what constitutes cruel and unusual punishment "draws its meaning from the evolving standards of decency that mark the progress of a maturing society." *Hudson v. McMillian,* 503 U.S. at 8, 112 S.Ct. at 1000 (citations omitted).

■ In the present case, the Defendants were confronted with an inmate who refused to comply with orders to undergo a strip search. He was repeatedly ordered to strip search. He steadfastly refused. His refusal constituted a breach of security. Prison officials acted with immense restraint in dealing with the matter. Trainee Sandra Jackson contacted her supervisor for assistance. Sergeant Layton subsequently consulted with Sergeant Golden. She also placed the Plaintiff in the holding cage to get him out of the way and to let the rest of the inmates be strip searched. Sergeant Golden talked to both Warden Moore and Captain Arnold. Sergeant Golden obtained authorization to use force, including the Nova shield. The Plaintiff was repeatedly given the opportunity to comply with orders. He refused to do so. His proper avenue to object to the order was to file a grievance, but he steadfastly refused to comply with the order to be strip searched. The Plaintiff's persistence in disobeying orders intensified the seriousness of the breach of security. The decision to use force was reasonable. The Plaintiff emphasized that the matter could have been avoided if officials would have allowed him to be strip searched by a man, as opposed to a female. However, inmates cannot be allowed to dictate policy. When Jackson ordered him to strip search, he was obligated to comply with the order or suffer the consequences of refusing to obey the order. The use of some force was reasonable. Regional Director Shaw noted that Sergeant Golden had several options. He could have used a force team without a Nova shield. He also had the option to use a force team with a Nova shield. He could have also used pepper gas. All three methods were approved by policy. The use of the Nova shield had the least potential to cause harm to the Plaintiff and force move team officers. The use of a force move team without a shield often leads to injuries. No injuries occurred here other than the Plaintiff's temporary loss of muscle control. The use of pepper gas could have been potentially dangerous since

the Plaintiff has asthma. The option employed by the Defendants was the least intrusive method and, indeed, it obtained the desired results without lasting injuries. The actions of the Defendants were objectively reasonable.

The Defendants' actions were also subjectively reasonable. The Defendants acted with the intent to restore security involving an inmate who steadfastly refused to comply with orders. The videotape makes it clear that the officers acted professionally. The Plaintiff acknowledges that members of the force team acted professionally. They acted with the good faith intent to restore security. The Plaintiff has not satisfied his burden of proving that the Defendants acted maliciously and wantonly. The Court is of the opinion, and so finds, that he has not satisfied his burden of proving that he was subjected to excessive use of force.

It should be noted that the Plaintiff sued Officer Weil for being the one who actually shocked him with the shield. The Plaintiff acknowledged when he rested that Officer Weil did not have the shield. The videotape clearly revealed that Officer Mitchell carried the shield. Consequently, the claim against Officer Weil was dismissed when the Plaintiff rested.

 Even if the Plaintiff had shown that his rights were violated, the Defendants would be entitled to a dismissal based on qualified immunity. The defense of qualified immunity shields government officials performing discretionary functions from liability for civil damages insofar as their conduct does not violate clearly established rights which a reasonable person would have known. *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). The doctrine of qualified immunity shields government officials "from civil damages liability as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated." *Fraire v. Arlington,* 957 F.2d 1268, 1273 (5th Cir.1992), citing *Anderson v. Creighton,* 483 U.S. 635, 638, 107 S.Ct. 3034, 3038, 97 L.Ed.2d 523 (1987). The objective reasonableness of an official's conduct must be measured with reference to the law as it existed at the time of the conduct in question. *Anderson,* 483 U.S. at 639, 107 S.Ct. at 3038–39; *Jackson v. City of Beaumont Police Department,* 958 F.2d 616, 620 n. 5 (5th Cir. 1992) (citations omitted). *See King v. Chide,* 974 F.2d 653 (5th Cir.1992) (discussing qualified immunity in the context of force used against an arrestee).

 The incident in question occurred on September 30, 1995. The clearly existing law at that time as to strip searches of male inmates by female inmates was *Letcher v. Turner, supra.* *Letcher* clearly authorized prison officials to have male inmates strip searched by female officers. There was no law in this circuit to the contrary. Officer Golden's insistence that the Plaintiff comply with the order to strip search before Trainee Sandra Jackson was reasonable in light of the law. The use of force was restrained and, moreover, was reasonable in light of clearly existing law to counteract the Plaintiff's persistent disruptive refusal to obey an order to strip search. The Defendants are entitled to have the claims against them dismissed because of qualified immunity.

In light of the foregoing discussion and analysis, it is accordingly

**ORDERED** that the complaint is **DISMISSED** with prejudice. It is further

**ORDERED** that all motions by either party not previously ruled on are hereby **DENIED.**