# IN THE COURT OF APPEALS OF IOWA

No. 4-032 / 13-1842
Filed February 5, 2014

IN THE INTEREST OF D.E., K.E., AND P.E.,
Minor Children,

C.E., Mother,
Appellant,

J.E., Guardian,
Appellant.

_____

Appeal from the Iowa District Court for Clinton County, Phillip J. Tabor, District Associate Judge.

A mother and the guardian of her children appeal separately from the permanency review order placing the children with the father in children-in-need-of-assistance proceedings. **AFFIRMED ON BOTH APPEALS.**

Matthew Noel, Dubuque, for appellant mother.

Adrienne C. Williamson of Pillers and Richmond, Clinton, for appellant guardian.

Thomas J. Miller, Attorney General, Bruce Kempkes, Assistant Attorney General, Mike Wolf, County Attorney, and Cheryl Newport, Assistant County Attorney, for appellee State.

Neill Kroeger, LeClaire, attorney and guardian ad litem for minor children.

Considered by Potterfield, P.J., and Doyle and Bower, JJ.

**DOYLE, J.**

A mother and the guardian of her children appeal separately from the permanency review order placing the children with the father in children-in-need-of-assistance (CINA) proceedings. We affirm on both appeals.

### I. Background Facts and Proceedings.

C.E. is the mother of three children born in 1998, 2001, and 2007. This family has a long history of involvement with the Iowa Department of Human Services (Department). The family again came to the Department's attention in October 2012, after the school reported the youngest child had severe hygiene issues. At that time, the children were in the care and custody of their maternal grandmother, J.E.[1] The children lived with the mother and the grandmother in the grandmother's house, along with their grandfather and at least three dogs and five cats.

Upon investigation of the report, the Department discovered the house was in an unsanitary and unsafe condition, to put it mildly. This was not the first report of the condition of the grandmother's house; she admitted she "was first investigated for a dirty house in 2001." She also admitted the oldest child had a problem soiling himself, but he had never been seen by a doctor for the condition. Clothing in his doorway and room was found soiled with human and cat feces.

---

[1] Although there is no formal documentation in the record showing the grandmother was appointed the children's legal guardian, the grandmother reported at the beginning of the case that the children were placed in her guardianship after the mother's ex-boyfriend "took a knife to [one of the children], then held [another child] over the castle at [a park and was then] caught trying to throw the children over [a local bridge]." All parties have operated throughout the case as if the grandmother is the children's legal guardian; neither the mother nor the father challenged this during the case.

Both the grandmother and the mother agreed to a safety plan requiring a doctor see the children; the family clean the home and maintain its cleanliness; the children have clean clothes and bathe daily; and the family work with the school to ensure the children's personal hygiene was improved and their head lice treated. The children were thereafter adjudicated CINA, and the permanency goal was for the children to remain in the grandmother's home.

From October 2012 to June 2013, the family continued to make progress on repairs of the home. However, prior to the August review hearing, the children's guardian ad litem (GAL) reported he had visited the family's home, and

> [t]he house was pretty much in the same condition [as he] saw it [in] June. It is certainly better than at the time of adjudication but there is much that can be done to improve the home. [He] did not see anything that was a particular danger to the children except the possibility of an electrical fire . . . . Cat smell was still present and the home was dirty overall. Insects were also observed.

The GAL noted that the grandparents were angry at the Department's involvement and blamed the Department for all of their problems, and he stated it appeared they would no longer be cooperative. He believed the children were doing pretty well, but he noted the parenting could be improved. He observed that the grandparents loved the children, but also the grandparents were "happy with the way they live and have probably received as much benefit from services as they will accept." The GAL recommended continued court involvement.

The Department's July 2013 report to the court noted some ongoing concerns regarding the children's hygiene, medical care and treatment, and the overall conditions in which they lived. However, the Department recommended continuing the permanency goal of the children of remaining in the grandmother's

home, with the same safety plan in place requiring the family to continue to clean and maintain the home, as well as maintain proper hygiene and medical treatment of the children. Following the review hearing, the court continued the children's placement with the grandmother, and it set a permanency hearing.

By the time of the October permanency hearing, the Department was requesting the court modify the permanency goal and place the children with their father. The Department noted that since the prior hearing, the children had begun school, and the school reported they had "[o]ngoing issues with lice, hygiene—predominantly cat urine smell, no medication, inappropriate clothing, and truancy." The school advised the Department that these issues had been brought to the grandmother's attention, but her reaction was "hostile" and resulted in an incident at the school for which she was ultimately charged with and found guilty of disorderly conduct and assault. A no-trespass order was issued to the grandmother barring her from the school property as a result of the incident. The school stated it had concerns for the overall stability of the children's home environment.

Additionally, the Department reported the family's home continued to have problems, noting that compared to the prior month, "the home had a stronger urine smell." Although the Department believed the grandmother had made "huge strides in cleaning up the home and trying to make repairs to the home," it still had concerns about the safety and health of the children in the home. It determined "the children should not have to be subjected to [the grandmother's] standard of living" any longer, and it recommended the children be placed with their father, whose home was found to be safe and appropriate.

A permanency hearing was held in October 2013, and the court received evidence and testimony from the parties. Thereafter, the court entered its ruling changing the children's placement from the grandmother's care to placement with their father. The court also changed the permanency goal to placement with the children's father.

The mother and grandmother now appeal, separately. The mother asserts the juvenile court lacked authority to change the permanency order. Both the mother and grandmother challenge the sufficiency of the evidence to support the court's permanency order changing the children's placement.

## II. Scope and Standards of Review.

We review a juvenile court's permanency order de novo. *In re K.C.*, 660 N.W.2d 29, 32 (Iowa 2003). We have a duty to "review both the facts and the law and adjudicate rights anew." *Id.* We give weight to the juvenile court's findings of fact, particularly its credibility determinations, but we are not bound by them. Iowa R. App. P. 6.904(3)(g); *see also K.C.*, 660 N.W.2d at 32.

We note that the parent-child relationship is constitutionally protected. *See Quilloin v. Walcott*, 434 U.S. 246, 255, (1978); *Wisconsin v. Yoder*, 406 U.S. 205, 233 (1972). However, "[t]he best interests of the child are paramount to our decision." *K.C.*, 660 N.W.2d at 32. In evaluating the best interests of a child, "[t]he primary considerations are 'the child's safety,' 'the best placement for furthering the long-term nurturing and growth of the child,' and 'the physical, mental, and emotional condition and needs of the child.'" *In re P.L.*, 778 N.W.2d 33, 37 (Iowa 2010). We "afford a rebuttable presumption that the best interest of a child is served when custody is with the natural parents." *In re N.M.*, 491

N.W.2d 153, 156 (Iowa 1992); *see also* Iowa Code § 232.1 (2013) (giving preference to a child's own home); *K.C.*, 660 N.W.2d at 32.

### III.  Discussion.

### A.  Juvenile Court's Authority.

The legislature made its intent clear by providing that chapter 232 "shall be liberally construed to the end that each child under the jurisdiction of the court shall receive, preferably in the child's own home, the care, guidance and control that will best serve the child's welfare and the best interest of the state."  Iowa Code § 231.1.  The welfare and best interests of the children are paramount.  *In re J.R.H.*, 358 N.W.2d 311, 317 (Iowa 1984).  We shall construe the statute guided by this principle.

> During a permanency hearing, the juvenile court
>
> shall consider the [children's] need for a secure and permanent placement in light of any permanency plan or evidence submitted to the court and the reasonable efforts made concerning the child[ren].  Upon completion of the hearing, the court shall enter written findings and make a determination identifying a primary permanency goal for the child[ren].

Iowa Code § 232.104(1)(c).  To that end, the court must take one of the following actions after the hearing:

> a. Enter an order pursuant to section 232.102 to return the child to the child's home.
> b. Enter an order pursuant to section 232.102 to continue placement of the child for an additional six months . . . .
> c. Direct the county attorney . . . to institute proceedings to terminate the parent-child relationship.
> d. Enter an order . . . to do one of the following:
> (1) Transfer guardianship and custody of the child to a suitable person.
> (2) Transfer sole custody of the child from one parent to another parent.

(3) Transfer custody of the child to a suitable person for the purpose of long-term care.

(4) If the [D]epartment has documented to the court's satisfaction a compelling reason for determining that an order under the other subparagraphs of this paragraph would not be in the child's best interest, order another planned permanent living arrangement for the child.

*Id.* § 232.104(2). However, if the court enters its order pursuant to section 232.104(2)(d), the court must also find convincing evidence that "termination of the parent-child relationship would not be in the best interest of the child[ren]"; "[s]ervices were offered to the child[ren]'s family to correct the situation *which led to the child[ren]'s removal* from the home"; and the children "*cannot be returned* to the child[ren]'s home." *Id.* § 232.104(2)(d), (3) (emphasis added).

The mother first challenges the court's authority "to terminate a guardianship." However, section 232.104(2)(d)(1), as cited above, explicitly gives the court authority to "[t]ransfer guardianship and custody of the child to a suitable person." Consequently, we find no merit in the mother's argument the court lacked authority to do just this. *See id.* § 232.104(2)(d)(1).

Additionally, she contends the juvenile court could not find convincing evidence that services were offered to correct the situation that led to the children's removal because the children were never removed from the grandmother's care until the entry of the permanency order. The State counters that her alleged errors were not preserved. Although we agree with the State, we nevertheless elect to bypass our error preservation concerns and proceed to the merits. *See, e.g.*, *State v. Taylor*, 596 N.W.2d 55, 56 (Iowa 1999).

Giving deference to our legislature's mandate to construe chapter 232 liberally in favor of best serving children's welfare, we conclude that prior removal

of the children from the grandmother's care was not a prerequisite under section 232.104 to changing the permanency goal in this case, though perhaps it would have been a better practice to have done so. Given the limited options before the court following the permanency hearing, as well as the time the court had already given the grandmother to correct the situation leading to the children's CINA adjudication and the overriding concerns for the children's best interests, the only real option for the court was to enter an order under section 232.104(2)(d). Here, the court concluded the evidence presented at the hearing established "that reasonable efforts [had] been made to prevent the change of permanency goal in this case," and, nevertheless, "continued placement in the home of the mother and current guardian and custodian would be and is contrary to the welfare of the children." The court's removal of the children at that time, along with its findings that reasonable efforts had been made to correct the situation leading to the CINA adjudication and that the children could not be returned to the home satisfies the removal requirements of section 232.104(3).

### B. Sufficiency of the Evidence.

Although the mother and grandmother appeal separately, they raise the same issue regarding the sufficiency of the evidence to support the juvenile court's order. Therefore, we address their claims together.

Ultimately, the mother and grandmother argue that because the children's hygiene and the condition of the home have improved since the beginning of the case, the court cannot now determine the home is too dirty or the children too unclean to require removal. Both point out the children's resilience, their good grades, and their excellent behavior. That they live in these conditions and

continue to do well in school is a credit to these children. However, the evidence overwhelmingly demonstrates that the mother and grandmother had little to do with this.

The youngest child has had head lice issues throughout the case. While head lice are a common occurrence in school age children, this child's condition required having her hair combed out almost daily by school personnel. When the grandmother was questioned at the hearing as to why the child continued to have this problem, she gave multiple excuses blaming others, though, by the time of the permanency hearing, both the mother and the grandmother had time to deal with the problem, as neither was employed.

The grandmother admitted at the permanency hearing the children had truancy and tardiness issues. However, she again blamed others for the children not being on time at school. She continued to report concerns she had about an officer at the school and his treatment of the children, but the evidence at the hearing showed that her concerns were completely unfounded. Nevertheless, she is still not convinced.

Perhaps most telling is the testimony of the student services director for the school district at the permanency hearing regarding his overall concerns:

> I'm concerned about supervision for these children. First of all, attendance. It harms education. Two of the children are special needs children, and of course, if they're not there, we can't work with them. That's an issue. We try very hard to keep the peer group ridicule under control. There are, you know, things like the cat urine smell. That's very distinctive, and you can smell it from down the hallway, and we certainly don't want to have the children put ill at ease with their peer group. We try to get that remediated and clothes changed quickly so the peer group [does not] acknowledge the problem. But then some of the complaints that [the grandmother] has had, if any of those conversations are

actually happening with the [children], I'm concerned for their well-being. Is this a conversation initiated from the [children], from another adult? How does it get going? Does it have any basis in fact? It's really wild allegations. And for their own security, their own . . . peace of mind, to . . . repeatedly [be] told an officer is out to get you is pretty unsettling for a child.

While we commend the grandmother for the progress she made in correcting the housing deficiencies and issues, we completely agree with the juvenile court's finding that "some improvement in an intolerable condition to where it is almost tolerable is not meeting the needs of these children." The juvenile court had four options at the conclusion of the permanency hearing pursuant to Iowa Code section 232.104(2), and it found the best interests of the children required changes in the children's placement and the permanency goal of the case. Upon our careful de novo review of the record, we conclude, as did the juvenile court, that the facts justify placing the children in the care and custody of their father and changing the permanency goal in the case to reunification with the father. Accordingly, we affirm the juvenile court's permanency order.

### IV. Conclusion.

For the foregoing reasons, we affirm the juvenile court's permanency order.

**AFFIRMED ON BOTH APPEALS.**